UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **TYRONE NOLING,** | ) | **CASE NO.  5:04 CV 1232** |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| | ) | |
| | ) | |
| **MARGARET BRADSHAW, WARDEN,** | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| **Respondent.** | ) | |

This matter comes before the Court upon Petitioner Tyrone Noling's ("Petitioner" or "Noling") Petition for a Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254, filed with this Court on December 15, 2004.  The Petitioner challenges the convictions and sentences of death imposed by the Portage County Court of Common Pleas.  The Court has before it the Petition, Respondent's Return of Writ, Petitioner's Traverse, Respondent's Sur-Reply, and Petitioner's Sur-Reply to the Respondent's Reply.  The matter is thus fully briefed and ready for disposition.

## I. PROCEDURAL HISTORY

Cora and Bearnhardt Hartig were found shot and murdered in their home on April 7, 1990. Although charges against Noling initially were dismissed in 1992, a grand jury re-indicted Noling on August 18, 1995, returning a five-count indictment against him for the aggravated murder and robbery of Bearnhardt and Cora Hartig, in violation of Ohio Revised Code §§ 2903.01(B) & (C); 2929.02; 2911.01(A)(2) & (B); and 2911.11(A)(1) & (B).  Counts one and two of the indictment contained the following three specifications, the first two of which are capital specifications: (1) that the murders were committed while committing an aggravated robbery and/or aggravated burglary, in violation of Ohio Revised Code § 2929.04(A)(7); (2) that the murders were committed in an attempt to escape apprehension or punishment for committing aggravated robbery in violation of Ohio Revised Code § 2929.04(A)(3); and, (3) that Noling had a firearm while committing the offenses in violation of Ohio Revised Code §§ 2941.141 and 2929.71(A).  Counts three, four, and five contained only the third, non-capital specification.

The trial court appointed attorney Peter T. Cahoon to serve as lead counsel, and attorney George G. Keith to serve as co-counsel to represent Noling.  *Return*, Apx. Vol. I, at 36.  A jury trial commenced on January 8, 1996.  *Return*, Apx. Vol. 2, at 474.  The jury returned a guilty verdict as to all counts on January 23, 1996.  *Id.* at 482-95.  The mitigation or sentencing phase of the trial commenced on February 6, 1996.  *Id.* at 496.  After reviewing evidence presented during that hearing, the jury recommended a death sentence.  *Id.* at 563.  The trial court accepted the jury's recommendation and issued its sentencing opinion, sentencing Noling to the death sentence on February 20, 1996.  *Id.* at 584-590.

Represented by Lawrence J. Whitney and Barry Ward, Noling filed a timely appeal to the Eleventh District Court of Appeals on March 20, 1996, raising the following fifteen (15) assignments

2

of error:

    1.    The trial court committed prejudicial error by allowing character evidence to be heard by the jury during the first phase of the trial; this evidence being victim impact evidence, over the objection of the defendant in violation of the defendant's rights as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Sections 9 and 10, Article I of the Ohio Constitution.

    2.    The trial court errored [sic] when it permitted the prosecution to introduce evidence of other acts of the defendant in its case in chief in violation of the appellant's rights as guaranteed to him by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

    3.    The trial court committed prejudicial error by failing to merge the capital specifications herein over the objection and motion to merge by the appellant in violation of appellant's rights as guaranteed to him by the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Sections 9, 10 and 16, Article I of the Ohio Constitution.

    4.    The trial court errored [sic] in failing to dismiss the indictment pursuant to the Rule 29 motion of the defendant at the close of the State's case for reason that the first specification to counts 1 and 2 charging a felony murder specification under O.R.C. 2929.04(a)(7) in violation of the appellant's rights to due process of law as protected by the Fifth, Sixth and Eighth Amendment to the United States Constitution.

    5.    The trial court committed prejudicial error in sentencing the defendant to the death penalty since based upon the law and the record of this case, the sentence of death herein is inappropriate and is disproportionate to the penalty imposed in similar cases and further the proportionality review that this court must conduct in the present capital case pursuant to Ohio Revised Code Section 2929.05 is fatally flawed and therefore the death sentence must be vacated pursuant to the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution and Sections 5, 9, 10 and 16 of Article I of the Ohio Constitution.

    6.    The trial court committed plain error in its instructions to the jury in the first phase of appellant's trial thereby denying appellant due process of law as required by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

    7.    The trial court committed plain error in its instructions to the jury in the penalty phase of appellant's trial, therefore denying appellant his right to due process of law as protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the

3

United States Constitution.

8.    The trial court committed error in its opinion which imposed a sentence of death upon appellant in violation of the appellant's rights as guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 5, 9, 10, and 16, Article I of the Ohio Constitution.

9.    R.C. 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05 as read together and as applied in this case violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 5, 9, 10 and 16, Article I of the Ohio Constitution.

10.   The trial court errored [sic] by failing to suppress evidence of the statements of appellant made in the presence of law enforcement officers in violation of appellant's rights as protected by Amendment V, United States Constitution.

11.   The trial court erred in granting the State's request to declare a witness hostile.

12.   The trial court erred when it failed to exclude photographs from the crime scene and coroner's office and appellant was denied a fair trial.

13.   The trial court erred in overruling appellant's motion for twelve (12) peremptory challenges to prospective juries [sic].

14.   The trial court erred in overruling defendant's motion to prohibit the use of peremptory challenges to exclude jurors who expressed concerns about capital punishment.

15.   The trial court erred in allowing the State to argue improperly before the jury depriving the defendant of a fair trial as mandated by the Sixth Amendment to the United States Constitution.

*Return*, Apx. Vol. V, at 82-94.  The Eleventh District Court of Appeals affirmed the convictions and

sentences of death on July 2, 1999.  *Id.* at 265-325.  Represented by Stephen A. Ferrell and Kelly

Culshaw of the Office of the Ohio Public Defender, Noling filed a notice of appeal to the Ohio

Supreme Court.  In a brief submitted on November 2, 1999, Noling alleged the following twenty-one

(21) propositions of law:

1.    Where a trial court precludes a capital defendant from cross-examining a witness about a strong motive to fabricate testimony, the trial court deprives

4

that capital defendant of his confrontation and due process rights as guaranteed by the Sixth And Fourteenth Amendments to the United States Constitution and Article I, §§ 10 and 16 of the Ohio Constitution.

2. A trial court abuses its discretion when it declares a witness hostile without the showing required by Ohio Rule of Evidence 607.  Further, when a trial court permits a witness to be impeached pursuant to Rule 607, the trial court has an obligation to control the nature and extent of that cross-examination.  The trial court's failure to do either violates a capital defendant's due process rights as guaranteed by the Fourteenth Amendment of the United States Constitution and § 16, Article I of the Ohio Constitution.

3. Where evidence of other crimes lacks a distinct behavioral fingerprint, such evidence is inadmissible.  Even where such evidence may be admissible, undue emphasis on it may prejudice a capital defendant's right to a fair trial and reliable death sentence.  U.S. Const. Amends. V, VI, VIII, and XIV.

4. A capital defendant's conviction cannot stand where it is against the manifest weight of the evidence.  To allow such a conviction to stand violates a capital defendant's due process rights as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, § 16 of the Ohio Constitution.

5. The death penalty is inappropriate and in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution as well as Article I, §§ 9, 10 and 16 of the Ohio Constitution.

6. Where the trial court admits victim impact evidence during the trial phase unrelated to the crimes, a capital defendant's rights as guaranteed [by the] Fourteenth Amendment to the United States Constitution and Article I, § 16 of the Ohio Constitution are violated.

7. The State may not obtain a conviction for an offense where the indictment for that offense failed to include an essential element of the offense.  To do so offends fundamental due process.  U.S. Const. Amend. XIV and Article I, §§ 10 and 16 of the Ohio Constitution.

8. A verdict that a defendant committed felony murder based on the charge that the murder was committed during an "aggravated robbery and/or aggravated burglary" cannot stand because it is duplicitous [sic].  This charge also deprives a defendant of his constitutional right to a unanimous jury verdict.  U.S. Const. Amends. V, VI, and XIV.

9. Reversible error occurs when the trial court instructions on mens rea relieve or reduce the State's burden of proof.  U.S. Const. Amend. XIV.

5

10.    The trial court's failure to merge duplicative aggravating circumstances prior to the sentencing phase of a capital trial deprives a capital defendant of the Eighth Amendment's protection of cruel and unusual punishment and his due process rights as guaranteed by the Eighth and Fourteenth Amendment [of the] United States Constitution and §§ 9 and 16, Article I of the Ohio Constitution.

11.    When the trial court precludes a capital defendant from pursuing and presenting relevant mitigating evidence, a capital defendant's rights to a fair sentencing proceeding and individualized sentencing as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and §§ 9 and 16, Article I of the Ohio Constitution are violated.  Moreover, when that evidence is relevant to rebut prosecutorial argument, the trial court's prohibition deprives a capital defendant of his right to a meaningful opportunity to rebut the State's case as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, § 16 of the Ohio Constitution.

12.    Where penalty phase instructions allow the jury to decide what evidence is admissible concerning the aggravating circumstances and where the instructions do not conform to Ohio and federal law, reversal is required. Furthermore, the trial court must instruct the jury during the penalty phase of a capital trial to only consider those aggravating circumstances attached to each count of aggravated murder in conducting the weighing process for that count. U.S. Const. Amends. VI, VIII and XIV.  Ohio Const. Art. I, §§ 9, 10, and 16.

13.    A capital defendant is denied his rights against cruel and unusual punishment and due process when his sentencing jury is told that its life sentence recommendation must be unanimous.  The capital defendant's right to the effective assistance of counsel is also violated when such instruction is not objected to at trial or raised on a first appeal of right.  U.S. Const. Amends. V, VI, VIII, and XIV.

14.    A capital defendant is denied his substantive and procedural due process rights to a fair trial as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution, as well as Article I, §§ 9 and 16 of the Ohio Constitution when a prosecutor commits acts of misconduct during voir dire, the trial phase and the sentencing phase of his capital trial.  He is also denied his right to reliable sentencing as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 9 and 16 of the Ohio Constitution.

15.    When trial counsel fail to voir dire on pretrial publicity, fail to object to prosecutor misconduct, fail to object to improper instructions, fail to follow up on issues of impeachment and argue penalty [sic] during their trial phase opening argument, a capital defendant is deprived of the right to the effective

assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, §§ 10 and 16 of the Ohio Constitution.

16.     Where the trial court admits victim impact evidence in the nature of a family member's request that a capital defendant be sentenced to death, a capital defendant's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 9 and 16 are violated.

17.     Reversible error occurs when the trial court's sentencing opinion fails to merge duplicative aggravating circumstances, relies on facts not properly in evidence, and fails to consider significant mitigating evidence.  U.S. Const. Amends. VIII and XIV.

18.     When the appellate court considers nonstatutory aggravating circumstances, evaluates mitigation evidence under improper standards, minimizes mitigation evidence, and burden shifts, the court's independent sentence review fails to focus on the individual and a capital appellant is deprived of the right to individualized sentencing and of his liberty interest in the statutory sentencing scheme thus violating rights guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 9 and 16 of the Ohio Constitution.

19.     Where appellate counsel fails to render effective assistance in the court of appeals, a capital defendant's right to due process under the Fourteenth Amendment to the United States Constitution and Article I, § 16 of the Ohio Constitution is violated.

20.     A capital defendant's right to due process under the Fourteenth Amendment to the United States Constitution is violated when the State is permitted to convict upon a standard of proof below proof beyond a reasonable doubt.

21.     Ohio's death penalty law is unconstitutional.  The Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 2, 9, 10 and 16 of the Ohio Constitution establish the requirements for a valid death penalty scheme.  Ohio Rev. Code Ann. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05, (Anderson 1996), do no meet the prescribed constitutional requirements and are unconstitutional on their face and as applied to Tyrone Noling.  Further, Ohio's death penalty statute violates the United States' obligations under international law.

*Return*, Apx. Vol. VI, at 32-7.  The Supreme Court of Ohio affirmed the convictions and sentence of

death on December 20, 2002.  *State v. Noling*, 98 Ohio St.3d 44 (2002).

7

Thereafter, Noling filed a petition for a writ of certiorari in the United States Supreme Court, presenting the following question for review:

> Where a trial court precludes a capital defendant from cross-examining a witness about a strong motive to fabricate testimony, the trial court deprives that capital defendant of his right to confrontation and due process rights as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

*Return*, Apx. Vol. VII, at 247.  The Supreme Court denied certiorari on June 2, 2003.  *Noling v. Ohio*, 539 U.S. 907 (2003).

Noling filed a petition for post-conviction relief, pursuant to Ohio Revised Code § 2953.21, on July 23, 1997, raising the following four (4) grounds for relief:

> 1. Where constitutional violations at trial have resulted in the conviction of one who is actually innocent, fundamental considerations of justice require the examination of evidence not available or not presented at trial which shows a fair probability that no reasonable juror would have convicted the petitioner. *See Schlup v. Delo*, 513 U.S. 298 (1995).
>
> 2. A conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Due Process Clause of the Fourteenth Amendment.  *United States v. Agurs*, 427 U.S. 97 (1976) . . . .  New evidence establishes that the prosecution engaged in a systematic effort to intimidate and coerce witnesses into providing false testimony against Petitioner.
>
> 3. The prosecutor was aware of exculpatory evidence which it did not disclose to the defense.  Butch Wolcott and Gary St. Clair state in their affidavits . . . that they were involved in a purse snatching in Alliance at the same time the Hartig murders were supposed to have happened.
>
> 4. Petitioner was deprived of his Sixth Amendment right to the effective assistance of counsel.  The right to the effective assistance of counsel is violated and a defendant is denied his right to a fair trial when counsel's deficient performance prejudices the defense.  *Strickland v. Washington*, 466 U.S. 688 (1984).

*Return*, Apx. Vol. VIII, at 8-34.

8

Thereafter, Noling amended his post-conviction petition, raising the following three (3) additional grounds for relief pertaining to his ineffective assistance of counsel claim:

      1.      Counsel were ineffective during cross-examination and argument concerning exculpatory evidence – the chair.

      2.      Counsel were ineffective during cross-examination and argument concerning exculpatory evidence – the gun.

      3.      Ineffective assistance of counsel for failure to object to pre-trial publicity.

*Return*, Apx. Vol. VIII, at 299-310.  On August 26, 1997, Noling filed a second amendment to his post-conviction petition, asserting one additional sub-claim to his ineffective assistance of counsel claim.  The post-conviction court dismissed Noling's petition on April 9, 1998.  *Return*, Apx. Vol. VIII, at 619-627.

Noling appealed that decision, raising the following six (6) assignments of error to the Eleventh District Court of Appeals:

      1.      The trial court erred in dismissing Petitioner's postconviction claims on the ground that all of the claims are barred by *res judicata*.

      2.      The trial court erred in dismissing the substantive grounds for relief raised in Petitioner's postconviction petition without allowing Petitioner to present at an evidentiary hearing the evidence accompanying the petition.

      3.      The trial court erred in dismissing Petitioner's claims of actual innocence on the ground that the affidavits of alleged accomplices should be looked upon with the "utmost suspicion" because the alleged accomplices recanted their testimony.

      4.      The trial court erred in dismissing Petitioner's claim of prosecutorial misconduct in presenting false testimony on the ground that the affidavits of the alleged accomplices describing prosecutorial coercion and coaching should be viewed with the "utmost suspicion" because they contain recanted testimony.

      5.      The trial court erred in dismissing Petitioner's claim of prosecutorial withholding of evidence on the ground that withheld evidence of the purse-snatching involving Petitioner and the alleged accomplices on the afternoon of

9

the murders was not exculpatory and it was not established that the result of the trial would have been different.

6.     The trial court erred in dismissing all of Petitioner's claims of ineffective assistance of counsel on the ground that the petition failed to allege or present sufficient operative facts of deficient performance, failed to allege or present sufficient evidence of prejudice, or involved matters of trial strategy not subject to review.

*Return*, Apx. Vol. 9, at 44-48.  In an opinion issued September 19, 2003, the Eleventh District Court of Appeals affirmed the post-conviction court.  *State v. Noling*, No. 98-P-0049, 2003 WL 22171433 (Ohio Ct. App. Sept. 19, 2003).

Noling appealed the decision to the Supreme Court of Ohio, filing a memorandum in support of jurisdiction that raised the following six (6) propositions of law:

1.     A trial court considering a petition for postconviction relief under R.C. 2953.21 *et seq.* may not apply the doctrine of *res judicata* to bar claims that cannot have been fairly determined on direct appeal without resort to evidence outside the record, even if the evidence was available at the time of trial.  To do otherwise would violate the Fourteenth Amendment Due Process rights of the defendant.

2.     A trial court may not, consistent with the Due Process Clause of the Fourteenth Amendment, limit a postconviction evidentiary hearing to the consideration of newly discovered evidence, but must consider in an evidentiary hearing all substantive grounds for relief supported by affidavits and other documents which raise factual allegations that cannot be determined by an examination of the files and records of the case.  Under the criteria adopted in *State v. Calhoun*, (1999), 86 Ohio St.3d, 279, a trial court errs in not holding an evidentiary hearing where the judge reviewing the postconviction petition did not preside at trial, multiple individualized affidavits support the petition, the key affidavits do not rely on hearsay, the affiants have been subject to retaliation, or the threat of retaliation, by the prosecution, and the petition claims that the prosecution fabricated and coerced false evidence.

3.     A trial court considering a postconviction claim of actual innocence based in part on recanted testimony may not, consistent with the Due Process Clause of the Fourteenth Amendment, irrebuttably presume that the recanted testimony is not credible and dismiss the claim without conducting an evidentiary hearing where the judge did not preside at the trial and hear the trial testimony of the

10

recanting witnesses and the recanting testimony is supported by other evidence suggesting the defendant's innocence.

4.      A trial court may not, consistent with the Due Process Clause of the Fourteenth Amendment, summarily dismiss a postconviction claim that prosecutors obtained and presented [to] the jury with false testimony through coercion and coaching on the ground that the witnesses who were coerced and coached into giving the false testimony are irrebuttably and conclusively presumed to be not credible because they aver that their testimony was coerced and coached.

5.      The withholding of evidence of an alibi – that Appellant and his alleged accomplices were involved in a purse-snatching in another town at the time of the murders – undermines confidence in the outcome of the trial.

6.      A trial court may not dismiss postconviction claims of ineffective assistance of counsel by simply concluding, without a factual or analytical basis, that counsel's performance was a matter of trial strategy and there was no resulting prejudice shown, when the claims are supported by evidence showing that counsel's performance fell below an objective standard of reasonableness and that counsel's errors were serious enough to undermined confidence in the outcome.

*Return*, Apx. Vol. 10, at 8-9.  The Supreme Court of Ohio declined jurisdiction and dismissed the

appeal on January 21, 2004.  *State v. Noling*, 101 Ohio St.3d 1424 (2004).

## II. FACTUAL HISTORY

In its consideration of Noling's direct appeal, the Supreme Court of Ohio set out the factual

history of this case, as revealed by the evidence adduced at Noling's trial.  The facts surrounding the

underlying incident are as follows:

On April 5, 1990, in the course of a burglary and robbery, defendant-appellant, Tyrone Noling, shot and killed Bearnhardt and Cora Hartig in Portage County, Ohio. After a 1992 dismissal of charges against Noling, a grand jury reindicted him in August 1995 for the Hartig murders. The state proved the offenses charged through the testimony of police officers and others, including accomplices Butch Wolcott and Joseph Dalesandro.

The testimony adduced at trial revealed that in early April 1990, Noling, Gary St. Clair, Dalesandro, and Wolcott stayed at the house of a teenage friend, Johnny Trandifer, in Alliance, Ohio. To obtain money, the group "went car shopping * * * opened up car doors that were unlocked and stole the change * * * radios, phones, whatever."

11

Noling then suggested "the idea that old people were getting their * * * Social Security checks early in the month and * * * would be the best target to rob." Noling planned to gain entry into the homes by knocking on the door and pretending to need to use their telephone to call about his disabled car. At that point, the group was armed with a shotgun and a BB gun.

Noling and St. Clair implemented just such a plan in robbing a Mr. and Mrs. Hughes in their Alliance home, approximately a quarter of a mile from Trandifer's house. Noling told Wolcott that he had knocked on the door, asked to use the phone because his car was broken down, and when he and St. Clair got in, they held the Hugheses up. According to St. Clair, Noling got inside, "kicked the door shut, pulled the sawed off shotgun out," and told Mr. Hughes, "Don't move." They used a pillowcase to carry away a VCR, jewelry, and a .25 caliber pistol.

Around noon the next day, Noling used this stolen .25 caliber pistol to rob the Murphy family in Alliance. Noling acted alone and said that he had had to fire the weapon while inside the house. Noling stole a VCR, rings, and money from the Murphy residence.

Around 3:30 to 4:00 p.m. that same day, Dalesandro drove Noling, St. Clair, and Wolcott from Alliance into Portage County. They stopped at the Hartigs' ranch home in Atwater Township. The Hartigs were both 81 years old. When Dalesandro stopped and Noling and St. Clair got out, Bearnhardt Hartig was mowing the grass.

Noling knocked on the front door, and when Cora Hartig answered, Noling "pushed his way in" and St. Clair followed him. St. Clair had the shotgun, and Noling had a .25 caliber semiautomatic, with one clip in the gun and another clip in his pocket.

After dropping Noling and St. Clair off, Dalesandro and Wolcott drove around for a while, returned, and parked in the Hartigs' driveway. About 20 to 30 minutes after Noling and St. Clair had entered the Hartigs' home, Wolcott "heard some gunshots, * * * heard a lady scream and then * * * a couple of more gunshots * * * and then a few seconds later [Noling and St. Clair] came running out" and got in the car.

Noling looked "flabbergasted," and things were hysterical. He told Dalesandro, who was driving, to "[g]et out of here * * * I just killed two old people." Noling said that "he had to do it, just didn't have a choice" because "the old man wouldn't stop, that he kept coming at him." Noling also claimed that the lady "could tell the police who they were." Noling put the .25 caliber pistol in the glove compartment, and Dalesandro drove back to Alliance.

Once back, Noling was concerned about getting rid of his blood-stained clothes. Noling also told Dalesandro that if Dalesandro said anything about what had occurred, Noling would kill him. That night, Noling also put a gun to Wolcott's head and said

that "if [Wolcott] talked he would blow [his] head off."

On April 7, 1990, James Davis, the son of neighbors of the Hartigs, noticed that the Hartigs' garage door was open and that the lawn tractor had been sitting in the yard for two days. He checked on the Hartigs and found them lying on their kitchen floor. Davis called the police.

The police found the bodies fully clothed in the kitchen and noticed a strong smell, apparently from decaying flesh. Detectives found ten Winchester .25 caliber shell casings near the bodies, and recovered eight .25 caliber bullets from the crime scene and autopsies. Nancy Bulger, a firearms expert, concluded that a single .25 caliber semiautomatic pistol had ejected all of the shells found and that a single weapon had fired all eight bullets recovered. Bulger testified that the ammunition clip for most .25 caliber semiautomatics carries six or seven rounds, but extended magazines for .25 caliber firearms, although not common, do exist.

In the Hartigs' master bedroom, detectives found open dresser drawers as well as seven empty ring boxes. In the living room, police found a metal box with a lock and key.

*State v. Noling*, 98 Ohio St.3d 44, 45-46 (2002).  Further facts will be set forth as necessary to decide Noling's grounds for relief.

### III. FEDERAL HABEAS PROCEEDING

Noling filed a Notice of Intent to file a federal habeas petition pursuant to 28 U.S.C. § 2254, a motion for appointment of counsel, and a motion to proceed in forma pauperis on June 30, 2004. Noling requested that attorney Kelly Culshaw from the Office of the Ohio Public Defender and John J. Gideon be appointed as counsel to represent him.  The Court granted the motion in part, permitting Culshaw to represent Noling but denied it as to the appointment of Gideon.  Instead, the Court appointed James A. Jenkins as co-counsel to represent Noling.  Thereafter, Noling filed a motion for relief from the Court's Order denying the appointment of Gideon.  The Court denied the motion. Noling filed a motion for an indefinite stay of execution during the pendency of this habeas proceeding, which the Court granted.

Noling filed a petition on December 15, 2004.  The Respondent filed a return of writ on

13

February 14, 2005.  After requesting and receiving two extensions to file a traverse, Noling filed the traverse on August 29, 2005.   Thereafter, the Respondent filed a sur-reply.  Noling filed a reply to the Respondent's sur-reply on October 4, 2005.

Concurrent with the filing of the traverse, Noling filed a motion to compel discovery.  The Court conducted an oral hearing on the motion.  The Court denied Noling's motion for discovery on November 4, 2005.  Noling filed a motion for reconsideration of the Court's order and a motion to clarify it.  The Court denied both motions.

Noling filed a motion for an evidentiary hearing and a motion to expand the record pursuant to Habeas Rule 7 on December 12, 2005.  The Court granted Noling's motion to expand the record, determining that it would assign whatever weight, if any, the items were entitled when it reviewed Noling's habeas petition.  The Court denied the motion for an evidentiary hearing.  Noling filed a motion to reconsider the Court's decision to deny an evidentiary hearing, which the Court denied.  Noling then filed a motion to expand the record pursuant to Habeas Rule 5, which the Court denied.

Noling filed a motion to stay this case and hold it in abeyance pending exhaustion in state court of his actual innocence claims on August 14, 2006.  Concurrently, he filed a motion for preservation of evidence.  The Court denied both motions.  Noling filed a motion to reconsider, which the Court denied.  He also filed a motion for an order directing the Plain Dealer newspaper to turn over public records, which he later withdrew.  Noling initiated state court proceedings to exhaust his claims on November 3, 2006.  On that same date, Noling filed a second motion to stay this case and hold it in abeyance, a second motion for discovery, and a motion for expert assistance.  The Court denied the motions.

The Court issued an order for counsel to provide it with an updated status on the state court

14

litigation on August 17, 2007.  Counsel filed a status report, indicating that the trial court had

dismissed Noling's successor petition and motion for a new trial on April 24, 2007.  He further

indicated that he is in the process of appealing the trial court's decision to the Eleventh District Court

of Appeals.  He also stated that he has requested leave to file a successor habeas petition with the

Sixth Circuit Court of Appeals on August 3, 2007.

## IV. GROUNDS FOR RELIEF

In his petition, Noling asserts fourteen (14) grounds for relief:

1.  Tyrone Noling is actually innocent of Bearnhardt and Cora Hartig's murders.  His convictions and death sentence violated the U.S. Constitution.  U.S. Const. amends. V, VIII, XIV.

2.  Tyrone Noling's due process rights to a fair trial and his right to a reliable sentence were violated because the trial court admitted inadmissible other acts evidence.  U.S. Const. amends. V, VI, VIII, and XIV.

3.  Tyrone Noling's rights to confrontation, to present a defense, and to due process were violated because he was denied the right to cross-examine a witness about a strong motive to fabricate testimony.  U.S. Const. amends. VI, XIV.

4.  Tyrone Noling's due process rights were violated because the trial court declared a witness hostile without the showing required by Ohio R. Evid. 607, then allowed impeachment of that witness well beyond the scope of Rule 607.  U.S. Const. amend. XIV.

5.  Tyrone Noling's substantive and procedural due process rights to a fair trial and his right to a reliable sentence were violated because the prosecutor committed acts of misconduct during voir dire, the trial phase, and the penalty phase of his capital trial.  U.S. Const. amends.  VIII, XIV.

6.  Tyrone Noling was prejudiced by his trial counsel's deficient performance.  U.S. Const. amends. VI and XIV.

7.  Tyrone Noling's due process rights were violated because appellate counsel failed to render effective assistance in his first appeal of right.  U.S. Const. amend. XIV.

8.  Tyrone Noling's due process rights were violated because he was convicted of an offense for which the indictment failed to include an essential element.  U.S. Const. amend. XIV.

9.  Tyrone Noling was deprived of his due process rights when the trial court instructed on mens

15

rea in a manner that relieved or reduced the State's burden of proof.  U.S. Const. amend. XIV.

10.  Tyrone Noling was deprived of his rights to a fair sentencing proceeding, individualized sentencing, and a meaningful opportunity to rebut the State's case when the trial court precluded him from presenting Jim Aylward's testimony.  U.S. Const. amends. V, VIII, XIV.

11.  Tyrone Noling's due process rights and protection against cruel and unusual punishment were violated because the trial court admitted victim impact evidence in the nature of a family member's request that a capital defendant be sentenced to death.  U.S. Const. amends. VIII, XIV.

12.  Tyrone Noling was denied his right against cruel and unusual punishment and due process because the trial court instructed his sentencing jury that its life sentence recommendation must be unanimous.  U.S. Const. amends. V, VIII, XIV.

13.  Tyrone Noling was deprived of the protection against cruel and unusual punishment and his due process rights because the trial court failed to merge duplicative aggravating circumstances prior to the mitigation phase of his trial.  U.S. Const. amends. VIII, XIV.

14.  Tyrone Noling's rights to due process and a reliable sentence were violated because the trial court's penalty phase instructions allowed the jury to decide what evidence is admissible concerning the aggravating circumstances.  Those same rights were also violated because the trial court failed to inform the jury that it could only consider those aggravating circumstances attached to each count of aggravated murder in conducting the weighing process for that count.  U.S. Const. amends. VI, VIII, and XIV.

## V. THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT

The Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"),

which amended 28 U.S.C. § 2254, was signed into law on April 24, 1996.  In *Lindh v. Murphy*, 521

U.S. 320, 336 (1997), the United States Supreme Court held that the provisions of the AEDPA apply

to habeas corpus petitions filed after that effective date.  *See also Woodford v. Garceau*, 538 U.S. 202,

210 (2003); *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999)("It is now well settled that AEDPA

applies to all habeas petitions filed on or after its April 24, 1996 effective date.").  Because Noling's

petition was filed on December 15, 2004, the AEDPA governs this Court's consideration of his

16

petition.

The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'" *Woodford*, 538 U.S. at 206 (citing *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). The requirements of the AEDPA "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, – U.S. – , 127 S.Ct. 2218, 2224 (2007)(citations omitted). Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This legal standard establishes a multi-faceted analysis involving a consideration of both the state court's reasoning and/or application of federal law, and its finding of facts.

With respect to Section 2254(d)(1), "clearly established federal law" refers to the holdings, as opposed to dicta, of the United States Supreme Court's decisions as of the time of the relevant state-court decision. *Williams*, 529 U.S. at 412; *Barnes v. Elo*, 231 F.3d 1025, 1028 (6th Cir. 2000).[1]

---

[1]  Although only Supreme Court case law is relevant under the AEDPA in examining what federal law is "clearly established," Circuit Courts of Appeals' decisions "may be informative to the extent [they] have already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court." *Hill v.*

17

The "contrary to" and "unreasonable application" clauses of the Section 2254(d)(1) are independent tests and must be analyzed separately. *Williams*, 529 U.S. at 412-13; *Hill*, 337 F.3d at 711.  A state court decision is "contrary to" federal law only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13.

Even if the state court identifies the "correct governing legal principle," a federal habeas court may still grant the petition if the state court makes an "unreasonable application" of "that principle to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 413.  A state-court decision also involves an unreasonable application if it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Id.* at 407; *Hill*, 337 F.3d at 711.  As the Supreme Court recently advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold." *Schriro v. Landrigan*, – U.S. –, 127 S.Ct. 1933, 1939 (2007)(citing *Williams*, 529 U.S. at 410).  The reasonableness of the application of a particular legal principle depends in part on the specificity of the relevant rule. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).  While the application of specific rules may be plainly correct or incorrect, courts may have more leeway in reasonably applying more general rules in the context of a particular case. *Id.*

As to the "unreasonable determination of the facts" clause in Section 2254(d)(2), the Supreme Court applied that section of 2254(d) in *Wiggins v. Smith*, 539 U.S. 510 (2003).  In that case, the

---

*Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003).

Court noted that a "clear factual error," such as making factual findings regarding the contents of

social service records contrary to "clear and convincing evidence" presented by the defendant,

constitutes an "unreasonable determination of the facts in light of the evidence presented."  *Id.* at 528-

29.  In other words, a state court's determination of facts is unreasonable if its findings conflict with

clear and convincing evidence to the contrary.  This analysis mirrors the "presumption of correctness"

afforded factual determinations made by a state court which can only be overcome by clear and

convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Mitchell v. Mason*, 325 F.3d 732, 737-38 (6th

Cir. 2003); *Clark v. O'Dea*, 257 F.3d 498, 506 (6th Cir. 2001)("regardless of whether we would reach

a different conclusion were we reviewing the case *de novo*, the findings of the state court must be

upheld unless there is clear and convincing evidence to the contrary.").  This presumption only applies

to basic, primary facts, and not to mixed questions of law and fact. *See Mason*, 325 F.3d at 737-38

(holding ineffective assistance of counsel is mixed question of law and fact to which the unreasonable

application prong of Section 2254(d)(1) applies).

By its express terms, however, Section 2254(d)'s constrained standard of review only applies

to claims that were adjudicated on the merits in the state court proceeding.  *Clinkscale v. Carter*, 375

F.3d 430, 436 (6th Cir. 2004).  When a state court does not assess the merits of a petitioner's habeas

claim, the deference due under the AEDPA does not apply.  *Id.*; *Newton v. Million*, 349 F.3d 873, 878

(6th Cir. 2003); *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003).[2]  In such a case, the habeas

---

[2]     Prior to *Maples*, the Sixth Circuit had applied the AEDPA standard of review to claims which had not been explicitly mentioned or analyzed by the state courts. *See e.g., Clifford v. Chandler*, 333 F.3d 724, 730 (6th Cir. 2003); *Doan v. Brigano*, 237 F.3d 722, 727 (6th Cir. 2001).  However, in *Maples*, the Sixth Circuit found that *Doan* and *Clifford* had been abrogated by the United States Supreme Court's decision in *Wiggins*.  *Maples*, 340 F.3d at 437.

court is not limited to deciding whether that court's decision was contrary to or involved an

unreasonable application of clearly established federal law, but rather conducts a *de novo* review of

the claim.  *Maples*, 340 F.3d at 436-37; *Benge v. Johnson*, 312 F. Supp.2d 978, 987 (S.D. Ohio

2004).[3]  If the state court conducts a harmless error analysis but does not indicate whether its finding

is based on state or federal constitutional law, however, a habeas court, while conducting an

independent review of the facts and applicable law, must nonetheless determine "whether the state

court result is contrary to or unreasonably applies clearly established federal law."  *Maldonado v.*

*Wilson*, 416 F.3d 470, 476 (6th Cir. 2005)(citing *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000)).


# VI. EXHAUSTION AND PROCEDURAL DEFAULT

## A. Exhaustion

A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas

corpus proceeding.  28 U.S.C. § 2254(b), (c); *Rose v. Lundy*, 455 U.S. 509 (1982).  Exhaustion is

fulfilled once a state supreme court provides a convicted defendant an opportunity to review his or her

claims on the merits.  *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).  A habeas petitioner satisfies the

exhaustion requirement when the highest court in the state in which the petitioner has been convicted

has had a full and fair opportunity to rule on the claims.  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir.

1994); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  If under state law there remains a

remedy that a petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court

---

[3]     To the extent that the state court did not address a claim due to petitioner's failure
to raise it on direct review, the claim may have been procedurally defaulted.
*O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Maples*, 340 F.3d at 437-38.

cannot entertain the merits of the claim.  *Rust*, 17 F.3d at 160.[4]

A petitioner "cannot obtain federal habeas relief under 28 U.S.C. § 2254 unless he has completely exhausted his available state court remedies to the state's highest court."  *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001)(quoting *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001))(internal quotation marks omitted).  Rather than dismiss certain claims the Court deems unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to state court would be futile.  *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001).  In circumstances where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state courts would no longer entertain the claim.  *Buell*, 274 F.3d at 349.   To obtain a merit review of the claim, the petitioner must demonstrate cause and prejudice to excuse his failure to raise the claim in state court, or that a miscarriage of justice would occur were the habeas court to refuse to address the claim on its merits.  *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000)(citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

Here, the Respondent concedes that state remedies for the claims Noling raises in the Petition have been exhausted.  *Return*, at 31.  The Court will perform no further exhaustion analysis on Noling's grounds for relief.

### B. Procedural Default

In general, a federal court may not consider "contentions of general law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure."  *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  If a "state prisoner has defaulted his

---

[4]     The Court also notes that the *Perry* rule, discussed *infra*, would bar
        on grounds of *res judicata* an Ohio court from considering any
        issue that could have been, but was not, raised on direct appeal.

21

federal claims in state court pursuant to an independent and adequate state procedural rule, federal

habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and

actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to

consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501

U.S. 722, 750 (1991).  To be independent, a state procedural rule and the state courts' application of it

"must rely in no part on federal law." *Fautenberry v. Mitchell*, No. C-1-00-332, 2001 WL 1763438,

at * 24 (S.D. Ohio Dec. 26, 2001)(citing *Coleman*, 501 U.S. at 732-733).  To be adequate, a state

procedural rule must be "firmly established and regularly followed" by the state courts at the time it

was applied.  *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991); *Williams v. Coyle*, 260 F.3d 684, 693

(6th Cir. 2001).  If a petitioner fails to fairly present any federal habeas claims to the state courts but

has no remaining state remedies, then the petitioner has procedurally defaulted those claims.

*O'Sullivan v. Boerckel*, 526 U.S. at 848; *Rust v. Zent*, 17 F.3d at 160.

  In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit outlined the now familiar

test to be followed when the State argues that a habeas claim is defaulted because of a prisoner's

failure to observe a state procedural rule:

> First, the federal court must determine whether there is a state procedural rule that is
> applicable to the petitioner's claim and whether the petitioner failed to comply with
> that rule.  Second, the federal court must determine whether the state courts actually
> enforced the state procedural sanction -- that is, whether the state courts actually based
> their decisions on the procedural rule.  Third, the federal court must decide whether the
> state procedural rule is an adequate and independent state ground on which the state
> can rely to foreclose federal review of a federal constitutional claim. Fourth, if the
> federal court answers the first three questions in the affirmative, it would not review
> the petitioner's procedurally defaulted claim unless the petitioner can show cause for
> not following the procedural rule and that failure to review the claim would result in
> prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001)(citing *Maupin*, 785 F.2d at 138)(further citations

omitted).

In determining whether the *Maupin* factors are met, the federal court looks to the last explained state court judgment. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000). If the last reasoned opinion on a claim explicitly imposed a procedural default, there is a presumption, which can be rebutted with strong evidence to the contrary, "that a later decision rejecting the claim did not silently disregard the bar and consider the merits." *Ylst*, 501 U.S. at 803. "If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review." *Id.* at 801.

If the three *Maupin* factors are met, the claim is procedurally defaulted. However, the federal court may excuse the default and consider the claim on the merits if the petitioner demonstrates that (1) there was cause for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error, or (2) a fundamental miscarriage of justice would result from a bar on federal review. *Maupin*, 785 F.2d at 138; *Hutchison v. Bell*, 303 F.3d 720, 735 (6th Cir. 2002); *Combs*, 205 F.3d at 274-275.

A petitioner can establish cause in two ways. First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Mohn v. Bock*, 208 F. Supp.2d 796, 801 (E.D. Mich. 2002). Objective impediments include an unavailable claim, or interference by officials that made compliance impracticable. *Murray*, 477 U.S. at 488; *Mohn*, 208 F. Supp.2d at 801. Second, constitutionally ineffective assistance of counsel constitutes cause. *Murray*, 477 U.S. at 488-489; *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994); *Mohn*, 208 F. Supp.2d at 801, 804.

If a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective

23

assistance claim must itself be presented to the state courts as an independent claim before it may be used to establish cause. *Murray v. Carrier*, 477 U.S. 478, 488-489 (1986). If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000).

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995)(quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004)(citing *Murray v. Carrier*, 477 U.S. 478, 495-96 (1985)). When the Supreme Court extended this exception to claims of capital sentencing error, it limited the exception in the capital sentencing context to cases in which the petitioner could show "'by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Id.* (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

While Noling generally asserts that ineffective assistance of counsel can be used to demonstrate the "cause" necessary to overcome any procedural default, he does not specifically apply

24

this assertion in the procedural default section of his traverse.  Instead, Noling defends each assertion

of procedural default when he addresses the individual grounds for relief.  The Court will likewise

address claims of procedural default when it reviews Noling's individual claims.  It will also address

Noling's assertion that ineffective assistance of counsel can serve as "cause" to excuse his

procedurally defaulted claims on an individual basis.

## VII. INDIVIDUAL GROUNDS FOR RELIEF

### A. First Ground for Relief - Actual Innocence

Noling first contends that he is entitled to federal habeas relief because he is actually innocent

of the Hartig murders.  He observes that there is no physical evidence linking him to the murders and

that the State's case relied principally on the testimony of his three co-defendants, all of whom

recanted their testimony either during trial or in affidavits supplied to the Ohio court during Noling's

post-conviction proceedings.

### 1. Procedural default

The Respondent alleges that this claim is partially defaulted.  Although the Eleventh District

Court of Appeals addressed the testimony of the co-defendants portion of this claim, it held that the

lack of physical evidence portion of the claim was barred by *res judicata* as it could have been raised

on direct appeal.  During post-conviction proceedings, Ohio courts can hold that a claim is barred by

res judicata based on the holding in *State v. Perry*, 10 Ohio St.2d 175 (1967).  In that case, the Ohio

Supreme Court held that a final judgment of conviction bars a convicted defendant from raising and

litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of

due process that was raised *or could have been raised* by the defendant at the trial on the merits, or on

appeal from that underlying judgment.  *Id.* at 108; *see also State v. Roberts*, 1 Ohio St.3d 36, 39

25

(1982)(holding policy behind *Perry* bars post-conviction petitioners from raising issues that could have been raised on direct appeal in a collateral proceeding to avoid reversal of conviction based on collateral, rather than constitutional, issues).  Thus, unless a claim is based on evidence *dehors* (outside of) the record, it must be raised during direct appeal, or be deemed waived.

Noling argues in the traverse that this Court may address this sub-claim because the *Perry* doctrine it is not an "adequate" rule under *Maupin*.  A procedural rule is not "adequate," unless, among other things, it is regularly and consistently applied.  *See Warner v. United States*, 975 F.2d 1207, 1213 (6th Cir. 1992), *cert. denied*, 507 U.S. 932 (1993)(stating that the rule only applies to "firmly established and regularly followed state practices.")(citing *Ford v. Georgia*, 498 U.S. 411, 422 (1991)).  Thus, Noling concludes, because of the Ohio courts' inconsistent application of *Perry*, this Court need not defer to an Ohio court's finding of a *Perry* violation.

To support his argument, Noling cites to several capital cases in which the Ohio Supreme Court, on direct appeal, *sua sponte* addressed the merits of claims the Court of Appeals had concluded were barred by *res judicata*, or considered claims that had not even been raised in the Court of Appeals and, thus, *should have been* barred by *res judicata*.

Some of the cases relied upon by Noling clearly do not support his argument and are, in fact, inapposite.  For instance, in each of the following three cases, a well-established exception to the *res judicata* doctrine applied, or the court did not actually engage in a merits review.  For example, Noling relies on *State v. Buell*, 22 Ohio St.3d 124, 142 (1986).  In *Buell*, the court analyzed the constitutionality of the imposition of the death penalty in light of the recently decided United States Supreme Court decision in *Caldwell v. Mississippi*, 472 U.S. 320 (1987), even though the appellant did not raise the issue at trial, or in his appeal to the Ohio Supreme Court.  The reason the Ohio

26

Supreme Court considered the claim *sua sponte* was that it *could not have been raised before*. *Caldwell* was decided in 1985, after Buell's appeal had been filed and resolved by the Ohio Court of Appeals.

Similarly, in *State v. Huertas*, 51 Ohio St.3d 22 (1990), the Ohio Supreme Court resolved an issue and ultimately granted relief on the basis of a Supreme Court opinion, *Booth v. Maryland*, 482 U.S. 496 (1987), *overruled by Payne v. Tennessee*, 501 U.S. 808 (1991), which was issued after the appellant's trial and after the appeal had been filed, but before the appellate court issued its decision. *Id.  Booth* held the use of victim impact evidence during the penalty phase of a capital trial is unconstitutional.  There is no indication in the opinion itself that the petitioner had failed to raise a claim based on the use of victim impact statements.  Thus, it is possible the *claim* had been raised below, even if the appellant could not have relief based on *Booth*.  Thus, *Huertas* is unhelpful to Noling.

Noling's reliance on *State v. Rogers*, 32 Ohio St.3d 70 (1987), suffers from the same defect. The court considered a claim based on the prosecutor's evidentiary use of the petitioner's post-*Miranda* exercise of his right to silence, in violation of the recently decided *Wainwright v. Greenfield*, 474 U.S. 284 (1986).  As in *Huertas* and *Buell*, the United States Supreme Court decision was issued after the appellant's direct appeal to the Court of Appeals, and, thus, the appeal to the Ohio Supreme Court presented the earliest opportunity for raising the claim.

In other cases, however, the Ohio Supreme Court did appear to ignore the *res judicata* bar and address the appellant's claims on the merits without explaining why it was doing so.  *See State v. Williams*, 38 Ohio St.3d 346 (1988)("Because of the gravity of the sentence that has been imposed on appellant, we have reviewed the record with care for any errors that may not have been brought to our

27

attention.  In addition, we have considered any pertinent legal arguments which were not briefed or

argued by the parties."); *State v. Hamblin*, 37 Ohio St.3d 153 (1988)("Because this is a capital case,

we will review all five arguments [even those not raised below] relating to the claim of ineffective

assistance of counsel."); *State v. Esparza*, 39 Ohio St.3d 8 (1988)(considering issue of jury venire,

even though it was "challenge[d] for the first time on appeal"); *State v. Barnes*, 25 Ohio St.3d 203

(1986)(stating, "since the instant argument was neither raised before, nor ruled on by, the court of

appeals, this court is not required to address it on the merits," but addressing the claim anyway).[5]

That the Ohio Supreme Court occasionally chooses to address the merits of the claims that are

otherwise barred from review on the basis of *res judicata* does not mean that Ohio's law of *res

judicata* is so inconsistent as to be inadequate, however.  Rather, these are the exceptions that prove

the rule.  There has been no showing that because of the above-mentioned exceptions, Noling or other

capital habeas petitioners *reasonably* came to believe the *Perry* rule had been abandoned in capital

cases.   Thus, there was no basis to conclude the exception had become the rule, or that it would have

been reasonable for a petitioner to assume it had.[6]

---

[5]     In virtually every case in which the Ohio Supreme Court has
forgiven a procedural default, and addressed a claim on its merits,
the court has concluded the claim was without merit.

[6]     The Ohio Supreme Court has expressly rejected the argument that
procedural bars are or should be less strictly enforced in capital
cases:

> The mere fact that punishments differ provides no
> basis to assert that procedural rules should differ in
> their application to the crime charged.  We hold that
> capital defendants are not entitled to special
> treatment regarding evidentiary or procedural rules.
> . . .  We will utilize the doctrine of waiver where
> applicable; yet we must also retain the power to *sua
> sponte* consider particular errors under exceptional

Ultimately, Noling's argument is unpersuasive.  The Sixth Circuit has specifically held that Ohio's application of the *res judicata* doctrine under *Perry* is an adequate and independent state ground.  *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001)("This court has held that [the *Perry* rule] is regularly and consistently applied by Ohio courts as required by the four-part *Maupin* test.")(citing *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000)).  *See also Mapes v. Coyle*, 171 F.3d 408, 420 (6th Cir. 1999), *cert. denied*, 528 U.S. 946 (1999)(noting that the *Perry* rule has been consistently applied).  Consequently, this Court finds that the second portion of Noling's actual innocence claim pertaining to the lack of physical evidence is procedurally defaulted.

Noling asserts two further arguments to persuade this Court that it can address this claim on the merits.  First, he claims that actual innocence claims are not subject to procedural default because they require a habeas court to review the entire habeas record.  He concludes that this review somehow prevents a finding of procedural default on actual innocence claims.  While Noling is correct that an actual innocence claim requires a review of evidence both presented at trial and developed since that time, his assertion that this type of claim would entitle him to forego a procedural default review is unfounded.  On the contrary, a habeas court must defer to the findings of the State courts unless they are contrary to or an unreasonable application of United States Supreme Court precedent.  *Panetti v. Quarterman*, – U.S. – , 127 S.Ct. 2842, 2872 (2007).  Here, the Eleventh District Court of Appeals found that Noling's actual innocence claim pertaining to the lack of physical evidence, the location of the shell casings, the bullet hole in a dining room chair, and the fact that the weapon used to kill the Hartigs was never recovered, was barred by *res judicata* because it could have

---

circumstances.
*State v. Greer*, 390 Ohio St.3d 236, 244 (1988).

29

been raised on direct appeal. *State v. Noling*, No. 98-P-0049, 2003 WL 22171433, at *8 (Ohio Ct. App. Sept. 19, 2003). Nothing about this application of the *Perry* rule would prevent the Court from applying the deference required to State courts under the AEDPA. Thus, the Court finds that this sub-claim of the first ground for relief is procedurally defaulted.[7]

Finally, Noling asserts that ineffective assistance of appellate counsel could excuse any procedural default of this claim. As is discussed *infra* when reviewing Noling's seventh ground for relief, however, the Court finds that Noling cannot establish that appellate counsel's failure to raise this claim on direct appeal prejudiced the outcome of that appeal. Thus, his assertions of ineffective assistance of appellate counsel cannot excuse his procedural default of this sub-claim.

### 2. Merits of non-defaulted sub-claim

Noling asserts that he can establish his actual innocence based on the affidavits of his co-defendants, Gary St. Clair, Butch Wolcott, Jr., and Joey Dalesandro. Each denies that he or Noling had any involvement in the Hartig murders. Noling raised this claim in his post-conviction petition,

---

[7]     Noling's assertion that a federal habeas court must review new evidence acquired since trial to assess an actual innocence claim serves only to diminish the merits of this ground for relief. Because Noling *has no new evidence* to support this sub-claim, Noling is hard-pressed to establish that what he is asserting is, in fact, an actual innocence claim. He is actually seeking to re-try his case in federal habeas court based on the identical physical evidence (or lack thereof) adduced during trial. A habeas court does not sit as a second trial court or a tertiary level of appeal. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988), *cert. denied*, 499 U.S. 1011 (1989). Because this sub-claim is based solely on record evidence, it is better classified as a "verdict against the weight of the evidence" claim. *See Herrera v. Collins*, 506 U.S. 390, 402 (1993)(citing *Jackson v. Virginia*, 443 U.S. 307, 318 (1979), finding that, in sufficiency of the evidence claims, a court "must limit itself to evidence adduced during trial because a 'sufficiency of the evidence review authorized by *Jackson* is limited to 'record evidence.' *Jackson* does not extend to non-record evidence, including newly discovered evidence.'"). Noling asserted such a claim on direct appeal but the Ohio Supreme Court concluded that it had no merit. *State v. Noling*, 98 Ohio St.3d 44, 54 (2002).

the first point at which he could raise this claim because the affidavits are evidence *dehors*, or outside

of, the record.  This claim is therefore preserved for federal habeas review.

When analyzing this claim on appeal, the Eleventh District Court of Appeals meticulously set

forth the assertions in the co-defendants' affidavits and compared them with their trial testimony as

follows:

> In examining whether the affidavits contradict the record, we must first
> look at the testimony given at appellant's trial. Wolcott, who was
> granted immunity by the prosecution for his testimony, testified that he,
> appellant, St. Clair, and Dalesandro devised a plan to target the elderly
> in an effort to rob them of their Social Security checks. They would gain
> entry into a victim's home by knocking on the door and, under the
> pretense that they were having trouble with their automobile, ask to use
> the telephone. Once inside the home, weapons would be shown and the
> victims would be robbed.
>
> Wolcott told the jury that they had successfully implemented the plan
> two times in Alliance, Ohio, before the final robbery ending with the
> Hartig's deaths.  On that day, April 5, 1990, Wolcott, St. Clair,
> Dalesandro, and appellant were driving around in Dalesandro's vehicle
> when they saw Mr. Hartig outside his home and decided he would be
> their next victim. Appellant and St. Clair exited the vehicle while
> Wolcott and Dalesandro were told to drive around for a few minutes.
> According to Wolcott, he saw appellant and St. Clair knock on the front
> door, and after a woman answered, observed appellant force his way
> into the home with St. Clair following him.
>
> When between twenty and thirty minutes passed and there still was no sign of
> appellant and St. Clair, Wolcott and Dalesandro became concerned that
> something had gone wrong. As a result, Dalesandro pulled into the victim's
> driveway. While parked in the driveway, Wolcott heard gunshots, a lady
> screaming, and then more gunshots. Appellant and St. Clair then ran out of the
> Hartig's home and entered Dalesandro's car. Wolcott testified that inside the car
> he saw the gun in appellant's hand smoking. He also claimed that as the four
> were traveling back to Alliance, appellant admitted to shooting both victims,
> and that from the time of the murders until their arrest appellant repeatedly
> threatened to kill anyone who spoke about the murders.
>
> In his affidavit, however, Wolcott denied participating in the two earlier
> robberies, as well as the Hartig murders. He maintained that it was only after

31

pressure from the prosecution, through repeated threats to withhold immunity and prosecute him for the crimes, that he agreed to testify against appellant. Wolcott also claimed that instead of committing the crimes they were accused of, he, appellant, St. Clair, and Dalesandro were involved in a purse snatching in Alliance at the same time the state theorized the murders here occurred.

St. Clair, who had previously entered a guilty plea for his role in the Hartig murders, testified in detail with respect to his involvement in the first two robberies and the plan that had been developed to gain access into the intended victims' homes. St. Clair also admitted that in his pretrial statement he told authorities that he and appellant had robbed the Hartigs and that appellant had shot them. However, both at trial and in his affidavit, he denied any involvement in the Hartig murders and explained that the only reason he pleaded guilty to the murders was because his lawyers told him that he would otherwise receive the death penalty. St. Clair claimed that he used the evidence shown to him by the prosecution to help him decide what to say.

In his affidavit, St. Clair continued to deny any involvement in the murders. He also reiterated his earlier declaration that he only pleaded guilty to avoid the death penalty. St. Clair maintained that he was involved in a purse snatching in Alliance on the day of the murders.

Appellant's final accomplice, Dalesandro, also testified about the events surrounding the first two robberies and how they had obtained access to the victims' homes. Dalesandro further testified that it was appellant's idea to target the elderly because they would be more vulnerable. With respect to the Hartig murders, Dalesandro explained how appellant gave him directions where to drive. Once they decided to rob the Hartigs, Dalesandro testified that appellant and St. Clair exited his vehicle and entered the home. Approximately thirty minutes later, Dalesandro saw appellant and St. Clair run across the front yard. When they reentered the vehicle, appellant told Dalesandro "get out of here" because he had "just killed two old people."  According to Dalesandro, he smelled the odor of gunpowder and saw blood on appellant's shirt.

Dalesandro told the jury that once they returned to Alliance he accompanied appellant when he sold two guns, a shotgun, and a "little gun" to someone named "Chico." After the four were later arrested and Dalesandro eventually was released, he received a telephone call from appellant who was still in jail. Dalesandro testified that during this conversation, appellant told him to dispose of a third gun that he had placed in the glove box of Dalesandro's vehicle. Dalesandro subsequently gave this weapon to "Chico."

Dalesandro's affidavit, however, stated that he was not involved in the Hartig murders and that he only agreed to a plea bargain because of pressure from his

32

> attorney and from his family. It further provided that he was with appellant, St.
> Clair, and Wolcott in Alliance on the day in question.

*State v. Noling*, 2003 WL 22171433, at *6-7.  This Court must accept the Eleventh District Court of

Appeals' factual findings regarding the content of the co-defendant's testimony and affidavits.  28

U.S.C. § 2254(d)(2).  Noling has not alleged, let alone demonstrated, that these factual findings are

unreasonable in light of the evidence presented in the state court.  Thus, the Court must accept the

Eleventh District's summarization of the co-defendants' trial testimony and affidavits when reviewing

them to adjudge Noling's actual innocence.

 Prior to doing so, however, Noling first must demonstrate that a so-called "free-standing"claim

of actual innocence is cognizable in a federal habeas court.  In *Herrera v. Collins*, 506 U.S. 390

(1993), a habeas petitioner alleged, as does Noling, that newly acquired evidence would exonerate

him of the crime of which he was convicted.  The petitioner argued that, because he was innocent, his

execution would offend the Eighth and Fourteenth Amendments of the Constitution.  *Id.* at 398.  The

*Herrera* Court concluded that "a claim of 'actual innocence' is not itself a constitutional claim, but

instead a gateway through which a habeas petitioner must pass to have his otherwise barred

constitutional claim considered on the merits."  *Id.* at 404.  At the close of the opinion, however, the

Court reasoned, *arguendo*, that the execution of a truly innocent person would violate the

Constitution, but opined that the threshold showing for such a case "would necessarily be

extraordinarily high."  *Id.* at 417.  Finding that the petitioner did not meet this abstract standard, the

*Herrera* Court denied his actual innocence claim.

 In the wake of *Herrera*, circuit courts, unsurprisingly, have divided on whether to recognize a

habeas petitioner's free-standing actual innocence claim.  In *Carriger v. Stewart*, 132 F.3d 463 (9th

Cir. 1997), *cert. denied*, 523 U.S. 1133 (1998), for example, the Ninth Circuit held that *Herrera* did

recognize this claim. Adopting the standard for actual innocence that Justice Blackmun announced in his dissenting opinion in *Herrera*, the Ninth Circuit determined that a habeas petitioner "must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Id.* at 476 (citing *Herrera*, 506 U.S. at 442–44). Other circuits, however, have determined that the *Herrera* Court never meant to hold that free-standing actual innocence claims were cognizable on habeas review, and merely assumed that the execution of an innocent person would be unconstitutional for argument's sake. *See, e.g., Sellers v. Ward*, 135 F.3d 1333, 1339 (10th Cir. 1998), *cert. denied*, 525 U.S. 1024 (1998)(holding that a free-standing actual innocence claim is not a basis for obtaining a writ of habeas corpus); *Lucas v. Johnson*, 132 F.3d 1069, 1074 (5th Cir. 1998)(holding that the language throughout the *Herrera* opinion denying habeas petitioner's right to free-standing actual innocence claim is controlling).

The Sixth Circuit has yet to provide definitive guidance on whether a free-standing actual innocence claim is cognizable in a habeas proceeding. In a series of unpublished decisions, it has stated that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Davis v. Burt*, No. 02-2333, 2004 WL 771224, at *8 (6th Cir. Apr. 9, 2004)(quoting *Herrera*, 506 U.S. at 400); *see also Marine v. Mack*, No. 03-3142, 2004 WL 237430, at *1 (6th Cir. Feb. 6, 2004)(same); *Campbell v. Berghuis*, No. 02-2185, 2003 WL 22435657, at *2 (6th Cir. Oct. 23, 2003)(same).

In its most recent unpublished decision on this issue, the Sixth Circuit reiterated in a non-capital federal habeas action that free-standing claims of actual innocence are not cognizable. In *Wright v. Stegall*, No. 05-2419, 2007 WL 2566047 (6th Cir. Sept. 5, 2007), the Sixth Circuit opined

34

that *Herrera* proscribed a free-standing claim of actual innocence in federal habeas proceedings. Citing the  recent United States Supreme Court case *House v. Bell*, – U.S. – , 126 S.Ct. 2064 (2006), in which the Supreme Court ruled that the petitioner had established a "gateway" actual innocence claim to excuse the default of another claim, the Sixth Circuit observed that the Supreme Court has declined to answer the question whether *Herrera* permits free-standing actual innocence claims.[8] Thus, the *Wright* court concluded that, "[s]ince the Supreme Court has declined to recognize a freestanding innocence claim in habeas corpus, outside the death-penalty context, this court finds that petitioner's claim is not entitled to relief under available Supreme Court precedent." *Wright*, 2007 WL 2566047, at *3.  While these cases are informative in predicting what a binding Sixth Circuit opinion on this issue may ultimately hold, "[i]t is well-established law in this circuit that unpublished cases are not binding precedent."  *Bell v. Johnson*, 308 F.3d 594, 611 (6th Cir. 2002).

In its published opinions, the Sixth Circuit has not denounced the existence of a free-standing actual innocence claim so forcefully.  In *Zuern v. Tate*, 336 F.3d 478, 482 (6th Cir. 2003), the Sixth Circuit stated, without finding, that *Herrera* precludes a free-standing claim of actual innocence.  *Id.* at n.1.  Similarly, the Sixth Circuit, again without expressly accepting or rejecting a free-standing claim of actual innocence, determined that a habeas petitioner failed to meet this standard.  In *In re Byrd*, 269 F.3d 544, 547–48 (6th Cir. 2001), the court concluded that the petitioner's evidence intending to prove his actual innocence "fail[ed] to meet the standard set forth in *Herrera v. Collins*." (citation omitted).  Although Judge Merritt clearly found in *House v. Bell*, 386 F.3d 668 (6th Cir.

---

[8]    The *House* Court held, as did *Herrera*, that a theoretical "demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim."  *House*, 126 S.Ct. at 2086-87 (quoting *Herrera*, 506 U.S. at 417).

2004), that a free-standing claim of actual innocence is cognizable in a federal habeas proceeding, his findings were contained in one of that court's dissenting opinions.  *Id.* at 686-709 (Merritt, J., dissenting).[9]

Presuming without finding that a habeas petitioner can assert a free-standing actual innocence claim, the Court now analyzes Noling's assertion of actual innocence, using the *Herrera* dissent's standard, *i.e.*, "the petitioner must show that he probably is innocent."  *Herrera*, 506 U.S. at 442 (Blackmun, J., dissenting).  When reviewing this claim on appeal from post-conviction relief, the Eleventh District Court of Appeals found that it lacked merit.  It held:

> Upon reviewing the three affidavits in question, we hold that the trial court did not abuse its discretion in assigning little or no credibility to them. Although the judge who reviewed appellant's petition did not preside over his trial, there are no allegations that the judge was unfamiliar with the case, or otherwise unprepared to consider appellant's arguments. Furthermore, St. Clair and Dalesandro, who are both incarcerated for their involvement in the murders, along with Wolcott, who also participated, obviously are interested in the success of appellant's efforts. In addition, the affidavits are based in large part on out-of-court statements. Therefore, they contain and rely on hearsay.

*State v. Noling*, No. 98-P-0049, 2003 WL 22171433, at *6 (Ohio Ct. App. Sept. 19, 2003).  Noling has provided this Court with no new evidence since the Eleventh District Court of Appeals reviewed the affidavits and compared them with the trial testimony.  Viewed through the deferential lens of the AEDPA review, he does not establish that the Eleventh District Court of Appeals' finding that the

---

[9]     Two judges on this Court have determined that *Herrera* bars free-standing actual innocence claims. *See Hartman v. Bagley*, 333 F.Supp.3d 632, 653 (N.D. Ohio 2004)(Gwin, J.)(holding that the *Herrera* Court has held that free-standing claims of actual innocence are not cognizable in federal habeas proceedings but noting that it recognized such claims could theoretically exist in *dicta*); *Spirko v. Anderson*, No. 3:95CV7209, 2000 WL 1278383, at *19-20 (N.D. Ohio July 11, 2000) (Carr, J.)(opining that a habeas court's sole responsibility lies in ensuring that the state afforded the petitioner a constitutionally sound trial, not to correct errors of fact).

affidavits were not credible in light of the co-defendants' obvious interest in Noling's exoneration was an unreasonable finding of facts under the circumstances.[10]

Even if it did not defer to the Eleventh District's findings, this Court would find that Noling's assertion of actual innocence falls far short of demonstrating that he is "probably innocent."  The three affidavits of the co-defendants, if taken as credible, would require this Court to accept that they had absolutely no involvement in the Hartig murders despite the fact that they were able to supply the police with multiple details about how it occurred.  Moreover, the trial testimony of Robyn Elliot, who stated that, shortly after the murders occurred, Noling asked her if she had heard about them and became agitated with Wolcott when he thought Wolcott had called the police, belies the self-interested assertions of the co-defendants that none of them had any involvement in the murders.  The co-defendants' affidavits serve only to contradict, but not undermine, the inculpating trial testimony. They do not establish that Noling is "probably innocent" of the Hartig murders.  Noling's first ground for relief is not well-taken.

### B. Second, Tenth, and Eleventh Grounds for Relief - Admission of Evidence

Noling contends that the trial court erred when deciding to either admit or exclude evidence during trial.  He claims that the trial court erred by admitting "other acts" evidence of previous crimes he committed.  Noling also complains that the trial court erroneously excluded the testimony of Ohio Public Defender Jim Aylward during the mitigation phase of trial.  Finally, he claims that the trial

---

[10]  Noling claims that this Court must not defer to the Eleventh District Court of Appeals' finding on this issue because that court failed to cite *Herrera* in its opinion.  As the United States Supreme Court has held, however, a state court need not cite to Supreme Court precedent so long as it does not apply that precedent in an unreasonable fashion.  *Early v. Packer*, 537 U.S. 3, 8 (2003).

37

court admitted victim-impact testimony in which one of the victim's family members repeatedly asked the trial court to impose the death penalty.

This court's review of the admissibility of trial evidence is a limited one. "Habeas review does not encompass state courts rulings on the admission of evidence unless there is a constitutional violation." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994). Admission of evidence is a matter of state law, and alleged error, such as improper admission of evidence, usually does not support a writ of habeas corpus. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). A state law violation, however, may rise to the level of a due process violation if it created a serious risk of convicting an innocent person. *Neumann v. Jordan*, 84 F.3d 985, 987 (7th Cir. 1996). Barring this circumstance, a federal court must defer to the state court's interpretation of its own rules of evidence and procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988), *cert. denied*, 488 U.S. 1011 (1989). A federal court does not act as an additional court of appeals to review a state court's interpretation of its own laws. *Id.*

The Court reviews each of these claims while observing that the United States Supreme Court has long held that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions" such as evidentiary issues. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle*, 502 U.S. at 68 (citations omitted); 28 U.S.C. § 2254(a). The responsibility of a federal court addressing state evidentiary issues is limited to a determination of whether the admission of evidence at issue violated the petitioner's right to due process and a fair trial. *Id.* A trial may be deemed fundamentally unfair if it can be shown by a reasonable probability that the outcome would have been different without

admission of the evidence or if there is a basis upon which to conclude that the result was unreliable.

*Lockhart v. Fretwell*, 506 U.S. 364, 370 (1993).  The *Estelle* Court noted that the category of

infractions that violate fundamental fairness is a narrow one.  *Id.*  (citing *Dowling v. United States*,

493 U.S. 342, 352 (1990)).

### 1. Second Ground for Relief

Noling argues that the trial court improperly admitted evidence of previous crimes he

committed.  First, the trial court allowed the prosecution to introduce evidence of two previous

robberies Noling committed.  It also admitted evidence of Noling's "car shopping" and an alleged

robbery that occurred at a Dairy Mart.  Noling maintains that the trial court's admission of his prior

bad acts prejudiced the jury against him.  Noling raised this claim to the Ohio Supreme Court on

direct appeal and it is therefore preserved for federal habeas review.

The Ohio Supreme Court addressed the merits of this claim on direct review.  While it

acknowledged that there were some differences between the robberies Noling committed just prior to

the Hartig murders, it found that the similarities of those crimes to the Hartig murders was sufficient

for the trial court to admit them under the *modus operandi* exception to Ohio Rule of Evidence

404(b).[11]  It reasoned as follows:

> In this case, Noling's robbery of the Hughes and Murphy families
> helped to establish Noling's identity as a participant in the aggravated
> robbery and aggravated murder of the Hartigs. That evidence also

---

[11]     That Rule states in pertinent part:
        **(B) Other crimes, wrongs or acts**
        Evidence of other crimes, wrongs, or acts is not admissible to prove the
        character of a person in order to show that he acted in conformity
        therewith.  It may, however, be admissible for other purposes, such as
        proof of motive, opportunity, intent, preparation, plan, knowledge,
        identity, or absence of mistake or accident.

39

showed Noling's "intent, preparation, [and] plan" in accordance with
Evid.R. 404(B). Noling had devised a scheme of securing entry and
robbing elderly persons in their homes by asking to use their telephone
on the pretense that his car had broken down. In each instance, Noling
was armed with a firearm. Each robbery occurred near the beginning of
the month when Noling thought that the families would have cashed
their Social Security checks. And in each instance, Noling targeted
elderly persons in their homes because he thought that they would be
more vulnerable.

Moreover, we note that the trial court instructed the jury that the
evidence was "received for a very limited purpose. * * * [Y]ou may not
consider it to prove the character of the defendant in order to show the
act in conformity or in accordance with the character." The court then
instructed the jury as to the limited purposes for which the jury could
consider such evidence. In fact, the court repeated an "other acts"
instruction at key points *throughout* the trial. In light of the instructions
given and the probative value of the evidence of the Murphy and
Hughes robberies, we find that the trial court did not abuse its discretion
in allowing this "other acts" evidence.

The court may have abused its discretion by admitting evidence that
Noling stole from unlocked cars or contemplated robbing a Dairy Mart.
Those offenses were not "similar acts" and did not show identity or a
common scheme or plan. No prejudicial error exists, however, because
the impact of that evidence was minimal given the other-acts instruction
and the abundant, compelling evidence of Noling's guilt.

Finally, Noling complains that "other acts" evidence also affected the
penalty phase. As discussed, the trial court properly admitted the
evidence of the Murphy and Hughes robberies at trial. Moreover, this
court has recognized that a defendant's prior crimes are directly relevant
to his "history, character, and background," R.C. 2929.04(B), which a
sentencing jury must consider. *State v. Waddy* (1992), 63 Ohio St.3d
424, 428-429, 588 N.E.2d 819. *Accord State v. Cooey* (1989), 46 Ohio
St.3d 20, 35, 544 N.E.2d 895. We thus overrule Noling's third
proposition of law.

*State v. Noling*, 98 Ohio St.3d 44, 52-3 (2002).

The Ohio Supreme Court found that the admission of the other acts evidence was relevant to

prove that Noling was, in fact, one of the perpetrators of the Hartig murders; it concluded specifically

that this evidence constituted strong circumstantial evidence to support the prosecution's theory of the case and to rebut Noling's chosen defense.  It also underscored the fact that the trial court repeatedly instructed the jury regarding the restricted purpose for which the evidence was admitted.  Under such circumstances, the Ohio Supreme Court found that it was not erroneous to allow admission of this evidence.

As noted above, the question for this Court is not whether it agrees with the state courts' interpretation of their own evidentiary rules or even whether, if presented with the same evidence at trial, this Court would have allowed it.  Instead, the question is whether the admission of  "other acts" evidence rendered Noling's trial fundamentally unfair.  Although the Ohio Supreme Court conceded that the trial court may have abused its discretion in admitting evidence regarding Noling's car thefts and contemplation of robbing a Dairy Mart, it found that the admission of this evidence was not prejudicial to the outcome of Noling's trial.  This Court also concludes that it was not prejudicial.  The Court finds, moreover, that in light of the substantial other direct evidence tying Noling to the robbery and murder of the Hartigs— including eyewitness identification testimony—the admission of the "other acts" evidence did not so materially affect the outcome of the trial as to render it fundamentally unfair.  Noling's second ground for relief is not well-taken.

### 2. Tenth Ground for Relief

In this ground, Noling maintains that the trial court erred when it precluded Jim Aylward, an Ohio Public Defender, from testifying during the sentencing phase of trial.  The defense team had proposed that Aylward testify regarding the sentencing options the jury could consider.  If given permission to testify, Noling argues, Aylward could have delineated for the jury precisely how long a period Noling would actually spend in prison if it imposed one of the life sentences.  Noling also

41

claims that this testimony could have rebutted the State's testimony regarding Noling's future dangerousness to society.

The Respondent asserts that this claim is procedurally defaulted because, although Noling raised it to the Ohio Supreme Court on direct appeal, he failed to first raise it in the Court of Appeals. Thus, the Ohio Supreme Court reviewed the claim for plain error.  Noling counters that the Ohio Supreme Court did not actually apply a procedural bar when reviewing his claim.  A review of the opinion, however, dictates a contrary conclusion.  Citing *State v. Williams*, 51 Ohio St.2d 112 (1977), the Ohio Supreme Court explicitly held that the claim was forfeited.  *State v. Noling*, 98 Ohio St.3d at 60.

Identifying the cases he utilized to assert that the *Perry* doctrine is inconsistently applied, Noling next asserts that this Court should hold that the Ohio Supreme Court's imposition of waiver in capital cases is too inconsistent to be an "adequate and independent" state ground afforded deference by this Court.  As this Court explained above, however, any Ohio Supreme Court inconsistency on this issue is too sporadic to find that Noling could reasonably expect that the court would not find that his claims were procedurally waived.

Noling next asserts that he can demonstrate cause and prejudice to excuse any default on several grounds.  He argues that ineffective assistance of appellate counsel and actual innocence can serve as cause and prejudice, requiring this Court to review the claim on the merits.  The Court is not persuaded by either assertion.  For the reasons set forth in Noling's first and seventh grounds for relief, reviewed elsewhere in this Opinion, Noling cannot utilize these claims to excuse any procedural default.

Even in the absence of default, the Court would find no merit to Noling's claim.  As the Ohio

Supreme Court reasoned in its alternative review of the claim on the merits, the testimony of Jim Aylward was not relevant to Noling's background, character, or social history.  Instead, Aylward would have testified about information the trial court supplied to the jury in its sentencing instructions.  Moreover, as the Ohio Supreme Court observed, Noling's counsel explained that Noling faced at least 29 or 39 years in prison because of the gun specification.  *Noling*, 98 Ohio St.3d at 60. Because Noling cannot demonstrate that the trial court's preclusion of Aylward's testimony rendered his trial fundamentally unfair, the Court finds this claim, were it not defaulted, would not be well-taken.[12]

### 3. Eleventh Ground for Relief

Noling complains that the trial court admitted improper victim impact evidence.  After the jury had rendered its death sentence but prior to the trial court's sentencing, the trial court heard testimony from Wilton Treash, a Hartig family member, who testified that the family wished the trial court to follow the recommendation of the jury and impose the death penalty.  *Return*, Trial Tr. Vol. 11, at 4-5. He also testified about the affect of the Hartigs' deaths on other family members and that imposing the death penalty in Noling's case might deter others from committing murder.  Because Noling raised this claim on direct appeal to the Ohio Supreme Court, it is preserved for review.

The Constitution provides no bar to victim impact statements during the sentencing phase of a trial.  The United States Supreme Court has held that, "if the state chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no

---

[12]    Noling argues that the Ohio Supreme Court failed to address the future dangerousness portion of his claim on the merits.  As the Respondent observes, however, Aylward could not have been used to rebut the State's claims of future dangerousness because Noling's counsel first raised this issue during closing argument.

per se bar." *Payne v. Tennessee*, 501 U.S. 808, 826 (1991).  The *Payne* Court further opined that, "[t]here is nothing unfair about allowing the jury to bear in mind [the victim's family's] harm at the same time as it considers the mitigating evidence introduced by the defendant."  *Id.*

When reviewing this claim on direct appeal, the Ohio Supreme Court held that, while a trial court can hear victim impact evidence regarding the effect the victim's death had on family members, it is not appropriate for the sentencing court to consider testimony regarding what sentence a defendant should receive based on such testimony.  *State v. Noling*, 98 Ohio St.3d 44, 67 (2002). Thus, it concluded that Treash's opinion asserting that Noling should get the death penalty was improper.  Nevertheless, the court found that Treash's remarks did not require reversal because the trial court's sentencing opinion did not demonstrate that it utilized this testimony when deciding how to sentence Noling.  *Id.*  This reasoning does not run afoul of the *Payne* holding.  Under *Payne*, the trial court could consider the impact on family members portion of Treash's statement in sentencing Noling.  The Ohio Supreme Court found that the trial court did not consider the improper portion of the victim impact testimony.  Noling does not refute this finding.  Thus, this claim lacks merit.

### C. Third and Fourth Grounds for Relief - Trial Court Error

In these grounds for relief, Noling maintains that the trial court erred in its decision to limit defense counsel's cross-examination of one of Noling's co-defendants and in its decision to permit the prosecution to treat a co-defendant as a hostile witness.

Although the Court reviews Noling's claims on an individual basis below, it observes at this juncture that these issues are predominantly issues of state law that are immune from attack on federal habeas review.  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  As stated above, a state law violation may rise to the level of a due process violation only if it created a serious risk of convicting an

44

innocent person. *Neumann v. Jordan*, 84 F.3d 985, 987 (7th Cir. 1996). Barring this circumstance, a federal court must defer to the state court's interpretation of its own rules of evidence and procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988), *cert. denied*, 488 U.S. 1011 (1989). A federal court does not act as an additional court of appeals to review a state court's interpretation of its own laws. *Id.*

### 1. Third Ground for Relief

Noling asserts that the trial court improperly limited defense counsel's cross-examination of Dalesandro. Prior to testifying, Dalesandro had agreed with the State to plead guilty to the Hartig murders. In his sentencing hearing, however, Dalesandro repudiated his prior statements, claiming that the prosecution was dictating his testimony. Dalesandro later requested and received a reinstatement of his deal with the State in exchange for his testimony at Noling's trial. Defense counsel obviously wanted to cross-examine Dalesandro. The trial court held an extensive hearing on this issue, determining that it would not permit defense counsel to cross-examine Dalesandro about a statement an assistant prosecutor made impugning Dalesandro's truthfulness. Noling now objects to the trial court's limitation.

Although Noling raised this issue to the Ohio Supreme Court, he failed to raise it to the Court of Appeals. Thus, the Ohio Supreme Court found that Noling forfeited the issue. As in his tenth ground for relief, Noling asserts both that the Ohio Supreme Court did not actually enforce a procedural bar because it addressed Noling's claim alternatively on the merits and that the Ohio Supreme Court's forfeiture rule under *Williams* is not adequate. Noling also asserts here, as he does above, that he can overcome any default by demonstrating ineffective assistance of appellate counsel and actual innocence to excuse the procedural default bar. For the reasons stated previously, the

Court finds this claim to be procedurally defaulted.  Additionally, Noling cannot establish cause and prejudice to overcome this default.

This claim lacks merit in any event.  The Ohio Supreme Court found that the trial court correctly excluded evidence of a prosecutor's opinion of Dalesandro's credibility because the trier of fact alone should make such determinations.  Moreover, the court held, the prosecutor's statement would have constituted hearsay pursuant to Ohio Rule of Evidence 802.[13]  The Ohio Supreme Court also observed that, despite this slight limitation, counsel conducted an extensive cross-examination of Dalesandro about his motives and his plea agreement with the State.  *State v. Noling*, 98 Ohio St.3d at 50.

The Ohio Supreme Court's review of Noling's claim is not an unreasonable application of Supreme Court precedent.  In fact, it does not apply any Supreme Court precedent because it is an issue of state law.  Noling's right to due process was not denied by the trial court's decision to preclude defense counsel from questioning Dalesandro on a hearsay statement.[14]

---

[13]    That Rule states:
**Evid R 802    Hearsay rule**
        Hearsay is not admissible except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statue enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio.

[14]    In his traverse, Noling asserts that the prosecutor's statement was not hearsay because it would have been offered for the impact it had on Dalesandro's testimony.  This assertion seems implausible.  It was not the prosecution's *opinion* about Dalesandro's credibility that altered his decision to cut a deal with the State.  Rather, it was the State's decision to re-prosecute Dalesandro with a potential for a longer sentence after he failed to cooperate with the State that likely motivated him to re-seek a deal.  Defense counsel more than amply underscored Dalesandro's motivations in their cross-examination of him.  Thus, Noling suffered no prejudice from this minor limitation.

46

## 2. Fourth Ground for Relief

In this ground for relief Noling contends that the trial court improperly declared St. Clair a hostile witness for the State.  Although St. Clair previously had made statements inculpating himself and Noling in the Hartig robbery/murders, when testifying at trial he asserted that he had no involvement in these crimes.  The State then sought and received permission to treat St. Clair as a hostile witness under Ohio Rule of Evidence 607.[15]  Noling complains that the State did not make a showing of surprise, as is required by the Rule, and that the trial court permitted extensive prosecutorial cross-examination of St. Clair with his prior statements, essentially reading them into evidence.  Noling raised this claim on direct appeal and the Ohio Supreme Court addressed it on the merits.  Thus, it is preserved for federal habeas review.

On appeal, the Ohio Supreme Court found that the trial court did not err in declaring St. Clair a hostile witness or permitting the prosecution to cross-examine him.  It reasoned:

> First, the trial court specifically instructed the jury that "[i]f statements in a transcript or written or typed statements differed from the testimony given by the same witness in the courtroom, you may consider them to test the credibility or believability of such witness, and *for no other purpose*."  (Emphasis added.) Noling neither objected to this instruction nor asked for additional instructions, and we presume that jurors follow the court's instructions. *See, e.g., State v. Williams* (1995), 73 Ohio St.3d 153, 159, 652 N.E.2d 721. Thus, we presume that the jury considered the substance of the inconsistent statement *only* as it reflected upon St. Clair's credibility.
>
> Second, we cannot say that the prosecutor's improper tactics actually prejudiced Noling in light of the other abundant evidence establishing Noling's guilt. Noling admitted to Wolcott, Dalesandro, and others that he had personally shot and killed the Hartigs.

---

[15]    That Rule states in pertinent part:
**Evid R 607    Impeachment**
**(A) Who may impeach**
        The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by a party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage.

47

Wolcott and Dalesandro also directly placed Noling inside the Hartigs' home with a .25 caliber semiautomatic pistol, the type of weapon used to kill the Hartigs. Moreover, St. Clair's total disclaimer of guilt, on behalf of Noling and himself, lacked any credibility because St. Clair had pled guilty to the murder of the Hartigs.

*State v. Noling*, 98 Ohio St.3d 44, 51 (2002).

The Ohio Supreme Court's reasoning is not contrary to any United States Supreme Court precedent.  Moreover, Noling cannot establish, as he must to succeed on this claim, that the trial court's decisions rose to the level of a due process violation.  Accordingly, this claim is not well-taken.

### D. Fifth Ground for Relief - Prosecutorial Misconduct

Noling asserts that the prosecution committed misconduct on several occasions prior to and during trial.  He maintains that the prosecution erred when it: (1) used peremptory challenges to excuse prospective jurors who were hesitant about imposing the death penalty; (2) presented false testimony through witness intimidation and threats; (3) withheld exculpatory evidence; (4) excessively cross-examined St. Clair; (5) improperly referenced Bureau of Criminal Identification and Investigation (hereinafter "BCI") expert Nancy Bulger's testimony to bolster its case; (6) encouraged the jury to infer that Noling had a bad character based on the people with whom he associated; (7) improperly used victim impact testimony in its closing argument; (8) improperly commented on Noling's failure to testify; (9) improperly asked the defense psychologist if he had contacted all the witnesses on the defense witness list; (10) asked penalty phase defense witnesses if Noling knew right from wrong; (11) argued that the nature and circumstances of the crime were aggravating circumstances; (12) focused on fear in its rebuttal argument; (13) said Noling's mitigating evidence did not relate to the crime; (14) compared Noling to his siblings; (15) improperly shifted the burden of proof during penalty phase closing arguments; and, (16) offered the opinion that the death penalty was

48

the appropriate sentence.

The Respondent asserts that sub-claims (1)-(4) and (16) are the only claims preserved for federal habeas review because Noling failed to raise the remaining sub-claims in the Ohio Court of Appeals.  Noling acknowledges this failure but asserts that this Court should nonetheless conduct a merit review of his claims for several reasons.  First, he contends that the Ohio Supreme Court's opinion is so interwoven with federal law, that it is not "independent" of it pursuant to the third *Maupin* factor.  He maintains that the Ohio Supreme Court's plain error review of each claim on the merits with citation to federal law excuses his failure to raise the claims to the Ohio Court of Appeals.

Noling's argument lacks merit.  The Sixth Circuit held in *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000), that "[c]ontrolling precedent in our circuit indicates that plain error review does not constitute a waiver of state procedural default rules."  Thus, the Ohio Supreme Court's alternative holding on the merits while reviewing a claim for plain error does not excuse Noling's failure to raise these claims in the Court of Appeals.  Accordingly, the Court finds that sub-claims (5)-(15) are procedurally defaulted.

Noling also argues, as he does in previous claims, that because the Ohio Supreme Court does not consistently apply procedural default in its capital cases, the Court should excuse any defaulted claims.  For the reasons stated previously, the Court rejects this argument.  Noling's assertions that ineffective assistance of trial and appellate counsel and/or his actual innocence excuse any default are also not well-taken pursuant to the Court's reasoning in the first, sixth, and seventh grounds for relief.  The Court finds sub-claims (5)-(15) to be procedurally defaulted.  Regardless of their defaulted status, however, the Court reviews each sub-claim on the merits.

**1. Sub-claim (1) - Use of peremptory challenges**

49

Noling argues that the prosecution misused its peremptory challenges when it excused venire members Swearinger, Mosser, and Blunt from jury service after each expressed reservations about imposing the death penalty.  He claims that excusing these prospective jurors created a jury that was predisposed to imposing the death penalty.

The United States Supreme Court has guided reviewing courts on how to conduct their analyses in instances where a defendant alleges improper juror inclusion or exclusion.  In *Gray v. Mississippi*, 481 U.S. 648 (1987), the Court determined that, because the right to an impartial jury was so intrinsic to the right to a fair trial, a harmless error analysis could not remedy such a trial defect. *Id.* at 668.   Rather than employ a harmless error analysis, a reviewing court must determine "whether [the trial court's] findings are supported by the record."  *Wainwright v. Witt*, 469 U.S. 412, 434 (1985).

Subsequently, in *Ross v. Oklahoma*, 487 U.S. 81 (1988), the Court limited *Gray*'s applicability to instances in which the trial court erroneously excluded a juror pursuant to *Witherspoon v. Illinois*, 391 U.S. 510, 521-22 (1968), in which the United States Supreme Court invalidated a capital sentence when the trial court excused all jurors who expressed a conscientious objection to the death penalty. The *Ross* defendant had argued that his constitutional rights were violated when he was forced to use peremptory challenges to exclude prospective jurors who appeared to favor the death penalty.  The *Ross* Court "reject[ed] the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury."  *Id.* at 88.  Noting that the Court has never held peremptory challenges to be of constitutional significance, the Court held that, "[s]o long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated."  *Id.*   While the *Ross* circumstances are somewhat distinct

50

from the prosecution's decision to utilize peremptory challenges, as Noling alleges here, its holding is apposite.  Noling cannot reasonably argue that his trial jury not was impartial.  Thus, the fact that the prosecution chose to exercise its peremptory challenges to excuse venire members who hesitated about imposing the death penalty is immaterial.

The Ohio Supreme Court did not unreasonably apply Supreme Court precedent when reviewing Noling's claim on direct appeal:

> Noling argues that the state improperly used peremptory challenges against jurors who were hesitant to impose the death penalty. This court has held that prosecutors may use peremptory strikes against prospective jurors who are hesitant about the death penalty. *See State v. Cook* (1992), 65 Ohio St.3d 516; *State v. Evans* (1992), 63 Ohio St.3d 231, 249. By failing to identify an error, Noling has thus failed to satisfy the first prong of our plain-error inquiry.

*State v. Noling*, 98 Ohio St.3d 44, 61 (2002)(parallel citations omitted).  The court correctly stated the law and found that the prosecution's use of peremptory challenges did not violate Noling's right to a fair trial under that law.  Noling's first sub-claim is not well-taken.

## 2. Sub-claim (2) - Prosecution presented false testimony

Noling asserts that the prosecution intimidated and coerced his co-defendants into testifying against him.  Although neither Noling nor the co-defendants had any involvement in the murder, he claims the prosecutor, Ronald Craig, threatened his co-defendants with the death penalty and suggested facts about the murder to them when they stated they did not know them.  On appeal from his denial of post-conviction relief, the Eleventh District Court of Appeals held that the affidavits of the co-defendants and their relatives were insufficient to substantiate his claims of coercion and suborning false testimony:

> In assignment of error four, appellant argues that the trial court erred in dismissing his claim of prosecutorial misconduct. He contends that the state introduced the coerced

testimony of his alleged accomplices knowing that it was false and misleading.

In order to make a finding of prosecutorial misconduct, a reviewing court must determine whether the challenged conduct was improper, and if so, whether it affected the defendant's substantial rights. *See, e.g., State v. Smith*, 87 Ohio St.3d 424, 442. A conviction will not be reversed because of prosecutorial misconduct, however, unless it so taints the proceedings that a defendant is deprived of a fair trial. *Id.*

Appellant primarily relies upon the affidavits submitted by his accomplices to support this claim. However, as previously noted, the trial court determined that these affidavits were not credible. Moreover, the affidavits of Harold Wolcott, Wolcott's father, and Robert St. Clair, St. Clair's father, contain numerous instances of hearsay and are similarly unreliable. Thus, there is simply no evidence that the state knowingly presented false testimony. Appellant's fourth assignment of error is without merit.

*State v. Noling*, No. 98-P-0049, 2003 WL 22171433, at *8 (Ohio Ct. App. Sept. 19, 2003).

At bottom, Noling's claims are credibility of witness issues that this Court typically cannot address in a habeas corpus proceeding pursuant to 28 U.S.C. § 2254(e)(1), which states:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgement of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). Not surprisingly, courts interpreting this post-AEDPA statute have been

reluctant to find that clear and convincing evidence exists to rebut the presumption. In *Seymour v.*

*Walker*, 224 F.3d 542, 552 (6th Cir. 2000), for example, the Sixth Circuit found that a habeas

petitioner who sought reversal of the district court's decision to deny the writ had not demonstrated

proof sufficient to overcome the 2254(e)(1) hurdle. While it found that the petitioner's arguments

"shed some doubt on the credibility of certain witnesses and [gave] interpretations of conflicting

evidence that differ from the interpretations of the state court," the court opined that "in light of the

deference to be accorded to state-court factfinding under § 2254(e) . . . [petitioner's] arguments are

not sufficient to demonstrate the incorrectness of the state court's findings by clear and convincing

evidence." *Id.   See also Mastracchio v. Vose*, 274 F.3d 590, 597-98 (1st Cir. 2001)(holding "federal habeas court ordinarily refrains from revisiting credibility determinations as 'it would be wholly inappropriate for a federal court to repastinate soil already thoroughly plowed and delve into the veracity of the witnesses on habeas review'")(citation omitted); *Givens v. Yukins*, 238 F.3d 420 (Table), 2000 WL 1828484, at *10 (6th Cir. Dec. 5, 2000)(stating habeas courts cannot "redetermine witness credibility" observed solely by the state court).  The same conclusion is warranted here; while the witnesses' testimony to which Noling points is undercut by their subsequent affidavits, it was up to the state courts to weigh the testimony of the witnesses or correct any findings of fact.

Finally, Noling asserts that *Napue v. Illinois*, 360 U.S. 264 (1959), applies.  In that case, the United States Supreme Court determined that the state's failure to correct the testimony of a witness who falsely testified that he had not received state encouragement to testify violated a petitioner's due process rights.  Other than Noling's own assertions, there is no evidence that the prosecution knowingly presented false testimony.  Moreover, defense counsel raised the issue of State deals with the co-defendants during trial.  This sub-claim lacks merit.

### 3. Sub-claim (3) - *Brady* claim

Noling next asserts that the prosecution withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  He claims that the State knew, but did not disclose to the defense, that there was evidence the co-defendants were actually committing a purse snatching in another township at the time the Hartig murders occurred.

To establish a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), "the petitioner has the burden of establishing that the prosecutor suppressed evidence; that such evidence was favorable to the defense; and that the suppressed evidence was material."  *Carter v. Bell*, 218 F.3d 581, 601 (6th

53

Cir. 2000)(citing *Moore v. Illinois*, 408 U.S. 786, 794–95 (1972)). "The inquiry is objective, independent of the intent of the prosecutors." *Id.* (citing *Brady*, 373 U.S. at 87). The *Brady* test applies not only to exculpatory evidence, but to evidence that could have been used for impeachment purposes. *United States v. Blackwell*, 459 U.S. 739, 758 (2006)(citing *United States v. Bradley*, 473 U.S. 667, 676 (1985)).

To meet the suppression requirement, the petitioner must show that the evidence was in the prosecution's exclusive control.  There is no *Brady* violation "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998), *cert. denied*, 528 U.S. 842 (1999)(internal quotation marks and citations omitted).  The United States Supreme Court has held that defendants are not required to "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Banks v. Dretke*, 540 U.S. 668, 695 (2004).  The duty to disclose exculpatory evidence applies to the prosecution whether or not the defense makes a *Brady* request.  *Apanovitch v. Houk*, 466 F.3d 460, 474 (6th Cir. 2006).

In *Kyles v. Whitley*, 514 U.S. 419 (1995), the Supreme Court held that a constitutional violation only occurs if the withheld, exculpatory items were material to the outcome of the trial. This test does not require a reviewing court to determine "whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. Moreover, the *Kyles* Court held, "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Id.* at 436-37.  Thus, there

is no requirement that the government maintain an "open file" policy to remain on constitutionally solid footing.  The prosecution must, however, use its discretion in determining the *cumulative* effect of suppression and disclose favorable evidence "when the point of 'reasonable probability' is reached."  *Id.* at 437.  Thus, when examining whether favorable, suppressed evidence was tantamount to a constitutional violation, a reviewing court must look at its collective impact on the defendant's due process right to a fundamentally fair trial.

On appeal from the denial of post-conviction relief, the Eleventh District Court of Appeals found Noling's claim lacked merit.  It reasoned:

> In the case at bar, even assuming that the state knowingly withheld evidence of a purse snatching there is no "reasonable probability" that the trial result would have been different. If appellant and his accomplices did participate in a purse snatching as he claims, that information was obviously known to appellant at the time of trial. In fact, he admits that he spoke with his attorney about this very topic. Furthermore, the fact that appellant may have been involved in another crime in a different area is not evidence of innocence. Although the state had a theory concerning the time of the murders, there is still a likely possibility that appellant and the three other individuals could have committed both the murders and the purse snatching. Therefore, in light of the other evidence presented at trial, we cannot say that the failure to disclose evidence of the purse snatching undermined confidence in the fairness of appellant's trial. Appellant's fifth assignment of error has no merit.

*State v. Noling*, 2003 WL 22171433, at *8.

The Eleventh District Court of Appeals' reasoning is not an unreasonable application of *Brady*.  Pursuant to the *Brady* test, the court logically concluded that any evidence pertaining to Noling's whereabouts during the time frame of the murders was undoubtedly known to Noling, and thus not in the exclusive control of the prosecution.  Moreover, it held that Noling's commission of another crime during the time frame in which the State asserted the murders occurred was not

exculpatory because that time frame was an approximation.  Because Noling cannot establish these two prongs of the *Brady* test, this claim must fail.

### 4. Sub-claim (4) - Excessive cross-examination of St. Clair

Noling argues in this sub-claim that the prosecution excessively cross-examined hostile witness Gary St. Clair regarding his prior inconsistent statements.  The Court held elsewhere in this Opinion that the trial court did not err in permitting the State to so cross-examine St. Clair.  Thus, Noling cannot argue, as he must to succeed on a prosecutorial misconduct claim, that the prosecution's cross-examination of St. Clair tainted his trial and rendered it fundamentally unfair.  Accordingly, for the reasons set forth in its prior review of this issue, the Court finds that this claim lacks merit.

### 5. Sub-claim (5) - Reference to BCI expert testimony

Noling argues that the prosecution exceeded its authority when it argued during closing statements that Noling had to re-load his weapon while killing the Hartigs.  He claims that the prosecution incorrectly stated that a .25 automatic weapon, the type used in the murders, holds only six bullets, thus requiring Noling to reload during the killings.

To assert a successful prosecutorial misconduct claim based on prosecutorial comments in a habeas proceeding, it "is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)(quoting *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)).  This question must be answered in light of the totality of the circumstances in the case.  *Lundy v. Campbell*, 888 F.2d 467, 473 (6th Cir. 1989), *cert. denied*, 495 U.S. 950 (1990).  The prosecutor's

comments must be so egregious as to render the trial fundamentally unfair.  *Fussell v. Morris*, 884 F.2d 579 (6th Cir. 1989)(Table).

The Sixth Circuit held in *Boyle v. Million*, 201 F.3d 711 (6th Cir. 2000), that a district court should first determine whether the challenged statements were, in fact, improper, and if so, it must determine whether the comments were "flagrant," thus requiring reversal.  *Id.* at 717.  Flagrancy is determined by an examination of four factors: (1) whether the statements tended to mislead the jury or prejudice the defendant; (2) whether the statements were isolated or among a series of improper statements; (3) whether the statements were deliberately or accidentally before the jury; and (4) the total strength of evidence against the accused.  *Id.* (citation omitted).

In its plain error review of this claim, the Ohio Supreme Court found that the prosecution's contention was a fair comment based on the evidence contained in the record.  *State v. Noling*, 98 Ohio St.3d 44, 61 (2002).  Moreover, during Ms. Bulger's testimony, the trial court sustained defense counsel's objection when the prosecutor suggested that an individual wishing to re-load a .25 caliber weapon would have to do so after six shots.  *Return*, Trial Tr., Vol. 5, at 808.  The prosecution was required to limit its testimony to the amount of shots that a *typical* .25 caliber weapon would hold. Thus, the jury knew from other portions of Ms. Bulger's testimony that some .25 caliber weapons hold seven to ten bullets.  Noling suffered no prejudice from the prosecutor's comment.

### 6. Sub-claim (6) - Petitioner's bad character

Noling claims that the prosecutor encouraged the jury to infer Noling's bad character based on the people with whom he associated.  During closing arguments in the culpability phase of trial, the prosecutor stated that the co-defendants were not "upstanding witnesses."  *Return*, at Trial Tr., Vol. 8, at 1501.

57

The Ohio Supreme Court found no plain error in this statement.  Instead of commenting on Noling's character, the court interpreted the prosecutor's statement as an attempt to circumvent the shortcomings of the State's own witnesses.  A review of this statement supports this interpretation. After making the comment about the witnesses, the prosecutor then stated, "Any one of these witnesses, any one of them if you didn't have all the other evidence . . . .  I could see saying you can't depend on that.  But you have all of this other evidence. . . ."  *Id.*  The Ohio Supreme Court's interpretation of the prosecutor's statement is a reasonable one.  This claim lacks merit.

### 7. Sub-claim (7) - Comment on Hartigs

Noling takes issue with the prosecutor's comment that the Hartigs could not explain what happened because they are dead.  The Ohio Supreme Court held that the comment did not result in plain error.  It opined that, "the prosecutor's assertion, over defense objection, that 'these people cannot tell you what happened, they are dead,' was a brief truism of no particular significance."  *State v. Noling*, 98 Ohio St.3d at 61.

This reasoning was not contrary to the *Donnelly* holding.  Observing that the jury obviously knew that the Hartigs could not relate what happened to them, the court held that the prosecutor's isolated comment regarding their inability to explain how the murders occurred was not prejudicial. This sub-claim is not well-taken.

### 8. Sub-claim (8) - Comment on Petitioner's failure to testify

Noling next claims that the prosecution unfairly commented on his failure to testify in violation of his Fifth Amendment rights.  During its rebuttal closing arguments at the culpability phase of trial, the prosecutor stated, "If the defendant failed to demonstrate or [in] any way, shape or

form explain - - ." *Return*, Trial Tr., Vol. 8, at 1502. Interrupting this statement, defense counsel immediately objected and requested a mistrial.

The United States Supreme Court held in *Griffin v. California*, 380 U.S. 609 (1965), that it is unconstitutional for a prosecutor or trial judge to comment on a criminal defendant's failure to testify. In *Griffin*, the prosecution had encouraged the jury to draw adverse inferences from the defendant's failure to testify. *Id.* at 610. The Court found that the prosecution's comments violated the defendant's Fifth Amendment right against self-incrimination. The Sixth Circuit also has reviewed several habeas actions in which the petitioner asserted that the prosecutor's comments on his failure to testify constituted a Fifth Amendment violation. In *DePew v. Anderson*, 311 F.3d 742 (6th Cir. 2003), the Sixth Circuit reversed a habeas petitioner's criminal conviction because the prosecution unfairly commented that the defendant's unsworn testimony was not subject to cross-examination. *Id.* at 750. Finding that the Ohio Supreme Court failed to utilize the "harmless error" test reserved for prosecutorial misconduct claims but instead upheld the conviction because of the brutal nature of the crime, the Sixth Circuit granted habeas relief.

Subsequent to *DePew*, the Sixth Circuit held that a prosecutor's indirect comments on a petitioner's failure to testify did not run afoul of the Fifth Amendment. In *Bowling v. Parker*, 344 F.3d 487 (6th Cir. 2003), the prosecutor stated during closing arguments: "[w]e have proven to you that he had a motive. We can't tell you what it is, because only the man that pulled the trigger knows. But we know that there is one." *Id.* at 514. Additionally, the prosecutor stated, "What the defendant cannot get away from here is the planning, the premeditation, the physical evidence, his actions, the callousness of it, and his lack of seeming remorse." *Id.* The petitioner asserted that these comments were effectively a comment on his failure to testify.

The Sixth Circuit disagreed.  While observing that, pursuant to *Griffin*, a prosecutor cannot comment about a criminal defendant's failure to testify, it noted that, when a statement indirectly comments on the defendant's decision not to testify, a habeas court should use the following four-factor test to evaluate such a statement: "(1) were the comments 'manifestly intended' to reflect on the accused's silence *or* of such a character that the jury would 'naturally and necessarily' take them as such; (2) were the remarks isolated or extensive; (3) was the evidence of guilt otherwise overwhelming; (4) what curative instructions were given and when."  *Id.* (quoting *Lent v. Wells*, 861 F.2d 972, 975 (6th Cir. 1988)).

Here, the Ohio Supreme Court found that the prosecutor's comment was not a comment on Noling's failure to testify:

> A prosecutor's reference to "uncontradicted evidence is not a comment on the accused's failure to testify."  *State v. Ferguson* (1983), 5 Ohio St.3d 160, paragraph one of the syllabus. *Accord State v. Webb* (1994), 70 Ohio St.3d 325, 329.  Moreover, isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning. *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 647.  Rather, an appellate court must review a closing argument in its entirety to determine whether prejudicial error exists.  *Frazier,* 73 Ohio St.3d at 342.  Even construing the prosecutor's remark as misconduct, it lacks prejudicial effect warranting reversal because the court sustained Noling's objection.

*State v. Noling*, 44 Ohio St.3d at 62.

These conclusions are also reasonable when subjected to the *Bowling* test.  The prosecutor's comment was isolated and the trial court sustained defense counsel's objection.  Moreover, there was ample evidence to support Noling's conviction.  Accordingly, Noling cannot demonstrate that the comment warrants habeas relief.

### 9. Sub-claim (9) - Psychologist contact with defense witnesses

During cross-examination of defense psychologist Dr. Jeffrey Smalldon, the prosecutor queried whether he had seen the defense's witness list.  He also asked whether Dr. Smalldon had interviewed the people on that list.  Noling claims that this question was improper because it created the inference that many of the people listed as defense witnesses ultimately were not called to testify.

On direct appeal, the Ohio Supreme Court found that, pursuant to state law, a prosecutor cannot comment about witnesses placed on the defense's list who are not called to testify.  The court held, however, that in light of the overall events of the trial and abundant evidence against Noling, this isolated comment did not constitute plain error.  *Id.* at 63.  This Court cannot find the Ohio Supreme Court's conclusion on this issue is an unreasonable application of any United States Supreme Court precedent.  While the question to Dr. Smalldon was improper under state law, Noling cites no Supreme Court precedent holding such comments are of constitutional magnitude.  Moreover, under the *Donnelly* test, the Court finds that this isolated question was not prejudicial to Noling's trial in light of the overwhelming evidence of his guilt.  This sub-claim is not well-taken.

### 10. Sub-claim (10) - Improper cross-examination of mitigation witnesses

Noling next argues that the prosecutor improperly questioned mitigation witnesses when he asked them whether they believed Noling knew right from wrong.  He asserts that because he did not raise his mental capacity under Ohio Revised Code § 2929.04(B)(3) as a mitigating factor, the prosecutor's question was unwarranted.[16]

The Ohio Supreme Court found no such violation.  After observing that the defense

---

[16]     That statute states that a sentencing body may find as a mitigating factor:
(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law.
Ohio Rev. Code § 2929.04(B)(3).

psychologist testified that Noling suffered from an antisocial personality disorder, a learning

disability, and a hyperactivity disorder or "brain disorder," the court found that the prosecutor's

queries did not exceed legitimate parameters. *State v. Noling*, 44 Ohio St.3d at 63. Moreover, it

reasoned, the questions aided the jury to place the psychological testimony in context. Noling cannot

assert successfully that these questions are in violation of any United States Supreme Court precedent.

### 11. Sub-claims (11), (12), (13), (14), (15), and (16) - Prosecutor mitigation closing argument

In his final sub-claims, Noling asserts that the prosecutor made several improper comments

during closing arguments of the penalty phase of trial or during penalty phase rebuttal arguments.

The Ohio Supreme Court carefully reviewed each claim, holding that, while one was improper, the

effect of this comment was not tantamount to prejudice. The court held that the remaining comments

were not improper. Its reasoning is as follows:

> First, the prosecutor did improperly suggest, over unsuccessful
> objection, that Noling's "two-day crime spree" was an aggravating
> circumstance. *See, e.g., Green,* 90 Ohio St.3d at 362 (other offenses are
> "not relevant to the specified aggravating circumstance"). This remark
> could not be said to have prejudiced Noling, given the court's
> instruction as to the aggravating circumstances to be considered. And
> evidence of the two-day crime spree was properly before the jury.
>
> In contrast, the prosecutor could appropriately refer to the facts of the
> offense, namely, the plan to commit the crime, the extra ammunition
> clip, the ransacking of the Hartigs' home, the disposal of the weapon,
> and the fact that the Hartigs were "old and helpless." "The facts [of an
> offense] are relevant in determining whether the nature and
> circumstances of the offense are mitigating." *Green,* 90 Ohio St.3d at
> 374 citing *Lorraine,* 66 Ohio St.3d at 420. Moreover, "both the criminal
> *and his crime* are properly considered in determining the propriety of
> imposing a death sentence." (Emphasis sic.) *Id.*, quoting *State v. Hill*
> (1996), 75 Ohio St.3d 195, 200.
>
> The prosecutor's comments that the crime was "scary" because it

62

involved a home invasion, that the crime "horrified" the community or "frightens us," and that Noling should not be allowed to walk the streets again were fair comments. "Prosecutors can be 'colorful or creative.' " *Wilson,* 74 Ohio St.3d at 399, citing *State v. Brown* (1988), 38 Ohio St.3d 305, 317. Moreover, Noling did not object, and because no prejudicial error resulted from such comments, Noling has failed to satisfy at least the third prong of our plain-error inquiry.

Nor did the prosecutor err by arguing that mitigation evidence, unrelated to the crime, should be given little weight. "Prosecutors can urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight." *Wilson,* 74 Ohio St.3d at 399. "The fact that * * * evidence is admissible * * * does not automatically mean that it must be given any weight." *State v. Steffen* (1987), 31 Ohio St.3d 111, paragraph two of the syllabus.

Equally permissible was the prosecutor's comparing Noling with his siblings who had an identical family background. Even though evidence concerning his siblings was scarce, some evidence exists in the record. Because Noling sought to mitigate his offenses by relying on his family background, the state could argue that others who had the same family background had not committed comparable crimes. *See, e.g.*, *State v. Campbell* (2000), 90 Ohio St.3d 320, 343 (court did not err by comparing law-abiding siblings from same abusive home to defendant); *Wilson*, 74 Ohio St.3d at 399 (arguing that others with deprived backgrounds do not commit such crimes was not error).

The prosecutor's brief comment that mitigation did not outweigh Noling's crimes did not impermissibly shift the burden of proof. The trial court's instructions, counsel's argument, and the verdict form clearly reflected the state's burden of proof. Moreover, Noling did not object.

Finally, Noling's complaint that reversible error exists because the prosecutor expressed a personal opinion that death was the appropriate punishment lacks merit. On three occasions, the court sustained defense objections to comments by the prosecutor that might be construed as a personal opinion on the death penalty. The prosecutor then rephrased his argument, and no prejudicial error resulted from these inartful comments. Although limits exist, " 'it is difficult for prosecutors to argue vigorously for the death penalty without making what might arguably be statements of personal opinion.' " *State v. Durr* (1991), 58 Ohio St.3d 86, 96 quoting *Tyler*, 50 Ohio St.3d at 41.

Noling received a fair trial, and prosecutorial misconduct did not

63

permeate the trial. Nor did any misconduct deprive Noling of his right
to a fair and individualized sentencing determination. We therefore
reject his fourteenth proposition of law.

*State v. Noling*, 44 Ohio St.3d at 63-4 (parallel citations omitted).

The Ohio Supreme Court's findings are not contrary to or an unreasonable application of

*Donnelly* or other United States Supreme Court precedent.  As the Ohio Supreme Court observed, any

error in the prosecutor's statements was cured by the fact that the trial court instructed the jury that

statements and arguments by the attorneys are not evidence.   The court reasonably concluded that,

with the exception of the prosecutor's comment on Noling's other crimes, the prosecution's comments

were not improper comments in light of the evidence presented during trial.  The prosecutor's one,

isolated remark on Noling's previous crimes did not prejudice the outcome of the mitigation hearing

because the jurors already had heard of Noling's previous robberies at the culpability phase of trial.

Accordingly, while this comment was improper, it was isolated and insignificant compared with the

evidence Noling presented during the mitigation hearing.  These sub-claims are not well-taken.

### E. Sixth Ground for Relief - Ineffective Assistance of Trial Counsel

Noling asserts fourteen (14) instances in which counsel's actions or failure to act violated his

Sixth Amendment right to counsel: (1) failure to object to duplicative counts and specifications in the

indictment; (2) failure to inquire about pre-trial publicity and its effect on prospective jurors; (3)

failure to conduct an adequate investigation regarding Dalesandro's deal with the State; (4) failure to

object to prosecutorial misconduct; (5) failure to object to jury instructions; (6) discussed punishment

during the culpability phase opening arguments; (7) stated in arguments that the jury must find

"dishonesty" in the State's case; (8) failure to pursue purse-snatching alibi; (9) failure to investigate

and present evidence of other suspects; (10) failure to impeach Wolcott and Dalesandro about

smoking gun; (11) failure to impeach Wolcott and Dalesandro about murder weapon; (12) failure to impeach State witnesses about the time frame of the murder; (13) failure to impeach State witnesses about the bullet hole in the chair and spent shell casings; (14) failure to impeach State witnesses about the chain of custody of the murder weapon; and, (15) failure to present *modus operandi* evidence distinguishing the Hartig murders and Noling's previous robberies.

The Respondent asserts all but two sub-claims, sub-claims (9) and (10), are procedurally defaulted.  Noling raised sub-claims (1)-(7) on direct appeal to the Ohio Supreme Court but failed to raise them to the Ohio Court of Appeals.  Thus, the Ohio Supreme Court held that these sub-claims were waived.  Noling raised sub-claims (11)-(15) in his post-conviction petition.  The Eleventh District Court of Appeals held that those sub-claims were barred by *res judicata* because they were either raised on direct appeal or should have been raised on direct appeal pursuant to *State v. Perry*, 10 Ohio St.2d 175 (1967).

 Noling argues that the Court should disregard any procedural default pursuant to *Perry* because that rule is neither "adequate" nor "independent" under *Maupin*.  As stated above, however, the Sixth Circuit has held that Ohio's application of the *res judicata* doctrine under *Perry* is an adequate and independent state ground.  *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001)("This court has held that [the *Perry* rule] is regularly and consistently applied by Ohio courts as required by the four-part *Maupin* test.")(citing *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000)).  *See also Mapes v. Coyle*, 171 F.3d 408, 420 (6th Cir. 1999), *cert. denied*, 528 U.S. 946 (1999)(noting that the *Perry* rule has been consistently applied).

As he does with other claims, Noling argues here that, even though the Ohio Supreme Court found certain sub-claims were procedurally defaulted, it forgave the default by addressing the merits

of those claims.  As stated previously, however, the Sixth Circuit held in *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000), that "[c]ontrolling precedent in our circuit indicates that plain error review does not constitute a waiver of state procedural default rules."  Thus, the Ohio Supreme Court's alternative holding on the merits while reviewing a claim for plain error does not excuse Noling's failure to raise these claims in the Court of Appeals.

Finally, Noling asserts that he can overcome any procedural default through his claims of ineffective assistance of appellate counsel and actual innocence.  For the reasons stated in grounds for relief one and seven, however, the Court finds that Noling cannot use these claims to excuse his procedural defaults.  Accordingly, sub-claims (1)-(8) and (11)-(15) are procedurally defaulted.

### 1. Previously adjudicated sub-claims (1), (4), (5)

These claims, as well as Noling's preserved sub-claims, lack merit in any event.  First, the Court will not review sub-claims (1), (4), and (5).  These sub-claims were raised as distinct grounds for relief in the Petition.[17]   Because the Court reviews these claims and finds that they are without merit, Noling's assertion that counsel were ineffective for failing to raise these issues at trial are also without merit because he cannot show the prejudice he must to succeed on an ineffective assistance of counsel claim.  *See United States v. Hynes*, 467 F.3d 951, 970 (6th Cir. 2006)("We need not decide whether defense counsel performed deficiently if disposing of an ineffective-assistance claim on the ground of lack of sufficient prejudice would be easier.").  Thus, whether or not they are procedurally defaulted, the Court finds that they are not well-taken.

To assert a successful ineffective assistance of counsel claim, a petitioner must satisfy the

---

[17]     Sub-claim (1) was raised as the thirteenth ground for relief; sub-claim (4) was raised as the fifth ground for relief, and sub-claim (5) was raised in the twelfth and fourteenth grounds for relief.

familiar two-prong test for ineffective assistance of counsel claims set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).   First, the petitioner must demonstrate counsel's errors were so egregious "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.*  Second, the petitioner must show he or she was prejudiced by counsel's errors. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.*

A petitioner must point to specific errors in counsel's performance.  *United States v. Cronic*, 466 U.S. 648, 666 (1984).   Thereafter, a reviewing court must subject the allegations to rigorous scrutiny, determining "whether, in light of all circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.  A reviewing court must strongly presume counsel's conduct was reasonable and might be part of a trial strategy.  *Id.* at 689.   "'Judicial scrutiny of a counsel's performance must be highly deferential'" and . . . 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'"  *Cone v. Bell*, 535 U.S. 685, 698 (2002)(quoting *Strickland*, 466 U.S. at 689).

To ascertain whether counsel's performance prejudiced a criminal proceeding, a reviewing court does not speculate whether a different strategy might have been more successful, but a court must "focus[] on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair."  *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). The Court now reviews Noling's remaining sub-claims pursuant to this standard.

### 2. Sub-claim (2) - Failure to inquire about pre-trial publicity

67

Noling alleges that counsel's failure to inquire about how any pre-trial publicity affected the venire was deficient.  During the jury selection process, the trial court asked the venire whether they had viewed any publicity related to the case.  Several venire members responded affirmatively.  One member, Eddie Renfroe, ultimately sat on the jury.  Noling complains that, because Mr. Renfroe admitted that he had viewed publicity on the case, he was influenced by it prior to his jury service.

In its alternative holding on the merits, the Ohio Supreme Court found that Noling's counsel were not ineffective for failing to question juror Renfroe.  It held:

> Nor does Noling establish either deficient performance or prejudice when he argues that his counsel did not adequately voir dire juror Renfroe about pretrial publicity. Renfroe never stated that he had read or knew about the case, only that he was "glancing through the newspaper" and noticed jury selection had been cancelled the previous week. Counsel made a reasoned tactical decision not to question Renfroe further, and "we will not second-guess trial strategy decisions such as those made in voir dire." *State v. Cornwell* (1999), 86 Ohio St.3d 560, 569, citing *State v. Mason* (1998), 82 Ohio St.3d 144, 157. Further, Noling has not explained adequately how this decision prejudiced him. *See Mason*, 82 Ohio St.3d at 157-158.

*State v. Noling*, 98 Ohio St.3d 44, 65 (2002).

The Court must now decide whether the Ohio Supreme Court's decision was an unreasonable application of United States Supreme Court precedent.  The United States Supreme Court has held that a federal habeas court's ability to review voir dire proceedings in state court is limited to "enforcing the commands of the United States Constitution."  *Mu'Min v. Virginia*, 500 U.S. 415, 422 (1991).  In that case, the Court determined that while a trial court must question potential jurors about their exposure to pre-trial publicity, the court need not inquire about what media coverage each had viewed.  *Id.* at 431.   In upholding the trial court's questioning of the venire, the Court reiterated that "[a] trial court's findings of juror impartiality may be overturned only for 'manifest error.'" *Id.* at 428

(citations omitted).

It is clear in the instant case that the Ohio Supreme Court was not unreasonable in finding no merit to this claim.  Mr. Renfroe stated that his pre-trial exposure to the case was that he had read jury selection had been cancelled for the Noling trial the previous week.  From that article, he surmised that his venire was selected to procure a jury for Noling's trial.  Because there is no indication that he was exposed to any other pre-trial publicity, Noling cannot argue that this innocuous exposure to the media was prejudicial.

### 3. Sub-claim (3) - Failure to investigate

Noling contends that counsel were ineffective for failing to investigate whether Dalesandro actually had a deal with the State.  During the presentation of the State's case, Dalesandro testified that the State had promised him a new deal in exchange for his testimony.  Trial counsel objected to this question, asserting that it was misleading.  The prosecution then informed counsel that it would be seeking to re-institute the deal it previously had formed with Dalesandro depending on the testimony he provided at Noling's trial.  The prosecution conceded that it had not discussed this deal with Dalesandro's counsel.  Although defense counsel indicated at that time that they wanted Dalesandro's counsel to be available to put this issue on the record, counsel did not pursue this matter further.

The Ohio Supreme Court found no evidence that counsel acted unreasonably when it reviewed this claim for plain error on direct appeal:

> Noling also argues that his counsel inadequately investigated the possibility of another pretrial agreement between Dalesandro and the state. That possibility, however, was discussed at trial. And because the record before us does not show what investigation Noling's counsel undertook, we cannot say that it reveals this alleged error. *See State v. Nields* (2001), 93 Ohio St.3d 6, 35, citing *Strickland,* 466 U.S. at 691; *State v. Sanders* (2001), 92 Ohio St.3d 245, 274. Nor does the record show any prejudice arising from

69

any such inquiry or lack thereof. We therefore reject Noling's claims in this regard as speculative.

*State v. Noling*, 98 Ohio St.3d at 65-6.

Noling cannot demonstrate that the Ohio Supreme Court applied *Strickland* unreasonably.  As the court stated, the reinstatement of Dalesandro's deal with the State was discussed during trial. Prior to conferencing this issue outside the presence of the jury, defense counsel queried Dalesandro about his motivations to testify.[18]  Thus, the jury was aware that Dalesandro had a motivation to testify favorably for the State.  Noling has not established that counsel's failure to discern whether any deal subsequently came to fruition was prejudicial to the outcome of his trial.

### 4. Sub-claims (6) and (7) - Counsel's argument

Noling next takes issue with defense counsel's decision to discuss sentencing in the opening statements of the culpability phase of trial and counsel's decision to urge the jury to acquit Noling if it doubted "the honesty of the State's case." *Petition*, at 10.  He asserts that these statements prejudiced him because they caused the jury to focus on the sentence prior to convicting Noling and because counsel misled the jury into believing that it must first find that the State's integrity was compromised before it could acquit him.

The Ohio Supreme Court found neither argument to be compelling.  In its review for plain error  it held that counsel's strategy to discuss the sentence in opening argument was entitled to deference.  *State v. Noling*, 98 Ohio St.3d at 66.  Moreover, it held that Noling's interpretation of the

---

[18]     Counsel questioned, "You wrote [the prosecutor] a letter and asking if you could have your deal back, is that right?"  Dalesandro responded affirmatively.  Counsel then queried, "Asked if you could have your deal back and you want to appear to those gentlemen to be cooperating because that is what it takes to get your deal back, isn't it?" *Return*, Trial Tr. Vol. 6, at 1136.  Dalesandro again responded affirmatively.

honesty of the State's case phrase was an interpretation that "no reasonable juror would have made." *Id.* Instead, the court found that counsel was merely questioning the credibility of the State's witnesses. A logical choice, given their backgrounds and prior criminal records.

The Ohio Supreme Court's adjudication of these claims was not an unreasonable application of *Strickland*. As stated above, the court found that neither one of the actions Noling asserts was constitutionally deficient was, in fact, so. Moreover, Noling is hard pressed to demonstrate how either of these two statements prejudiced the outcome of the culpability phase proceedings. These sub-claims lack merit.

### 5. Sub-claims (8) and (9) - Failure to present alternative evidence

In these sub-claims Noling takes issue with counsel's failure to investigate a purse snatching incident that occurred during the time in which the State argued the murders occurred. Moreover, Noling claims that counsel should have investigated other suspects to the murder. Prior to his death, Bearnhardt Hartig talked on the telephone with his doctor, Daniel Cannone. Dr. Cannone explained that Mr. Hartig was concerned that his insurance agent, Lewis Lehman, had failed to repay $10,000 that he had borrowed from Mr. Hartig. Leman owned a gun that was the same caliber as the gun that killed the Hartigs. Noling claims his counsel were remiss in failing to pursue Leman as a suspect.

The Eleventh District Court of Appeals found neither argument had merit. It held:

> Furthermore, the fact that appellant may have been involved in another crime in a different area is not evidence of innocence. Although the state had a theory concerning the time of the murders, there is still a likely possibility that appellant and the three other individuals could have committed both the murders and the purse snatching. Therefore, in light of the other evidence presented at trial, we cannot say that the failure to disclose evidence of the purse snatching undermined confidence in the fairness of appellant's trial. Appellant's fifth assignment of error has no merit.

* * *

71

A similar analysis is also applicable to appellant's claim that his trial attorneys rendered ineffective assistance of counsel by failing to present evidence of other suspects. He believes that if counsel had conducted a proper investigation, another perpetrator of the crime would have been found. In support, appellant attached a police report indicating that on the day before the murders, Bearnhardt Hartig was concerned about his insurance agent's failure to pay a $10,000 loan. He also attached a statement from the insurance agent in which he admitted to the police that he had once owned a weapon of the same caliber used in the Hartig murders.

It is unclear whether this evidence was part of the record at the time appellant pursued an appeal from his convictions. Nevertheless, even if it were not, this court cannot say that his attorneys were ineffective for failing to present it to the jury. The connection between the other suspect and the murders is tenuous at best. Therefore, appellant's attorneys may have made a reasoned tactical decision to not present this theory as part of appellant's defense, and appellant has not explained how this decision prejudiced him.

*State v. Noling*, No. 98-P-0049, 2003 WL 22171433, at *8, 11 (Ohio Ct. App. Sept. 19, 2003).

This reasoning does not run afoul of *Strickland*. The Court of Appeals found that the purse snatching did not necessarily provide Noling with an alibi. Thus, it is questionable whether counsel were unreasonable in pursuing this defense. Additionally, the Court of Appeals held that, other than Noling's conjecture, there was no basis to his theory that Mr. Hartig's insurance salesman committed the murders. The Court cannot find, as it must for Noling to prevail, that the Eleventh District Court of Appeal's decision was an unreasonable one. Thus, these sub-claims are not well-taken.

### 6. Sub-claims (10), (11), (12), (13), and (14) - Failure to impeach State witnesses

In these sub-claims Noling asserts that counsel were deficient for failing to impeach State witnesses on several occasions. He claims that counsel should have impeached Wolcott and Dalesandro regarding both their testimony that the gun was smoking when Noling returned to the car after the shootings and regarding the location of the murder weapon. Noling also asserts that counsel acted unreasonably when they failed to impeach State witnesses about the time frame of the murder, a bullet hole and shell casings found at the crime scene, and the chain of custody of the murder weapon.

72

On appeal from the denial of post-conviction relief, the Eleventh District Court of Appeals found that all but the smoking gun claim were barred by *res judicata*. It held that Noling could not demonstrate that his counsel's failure to question Wolcott and Dalesandro regarding the smoking gun testimony prejudiced the outcome of his trial because such questions would not have impeached their testimony. This Court finds that conclusion to be compatible with *Strickland* and therefore entitled to deference.

The Court finds that Noling's remaining sub-claims would not be well taken even if they had been preserved for federal habeas review. Noling cannot demonstrate that counsel's alleged failure to impeach State witnesses regarding the time frame of the murder, the bullet holes, and the chain of custody of evidence in any way prejudiced the outcome of his trial. Thus, Noling cannot demonstrate that any inactions on counsel's part rose to the level of a Sixth Amendment violation.

### 7. Sub-claim (15) - Failure to present *modus operandi* evidence

Finally, Noling asserts that trial counsel should have highlighted the differences between the Hartig murders and the other crimes he committed. Although this claim is procedurally defaulted, it would not be well-taken in any event. As the Ohio Supreme Court held when reviewing Noling's trial court error claim on this issue, there were enough similarities between these crimes and the robberies Noling previously committed to constitute a *modus operandi*. Moreover, it was clearly reasonable for trial counsel to forego an in-depth analysis of Noling's prior robberies, as the details of those robberies, in which he held elderly people at gunpoint, would not have painted a favorable picture of Noling before the jury. Thus, counsel's strategy to forego this distinction was reasonable. Noling's argument to the contrary merely represents the kind of hindsight second guessing that *Strickland*

73

proscribes.

### F. Seventh Ground for Relief - Ineffective Assistance of Appellate Counsel

Noling asserts that his appellate counsel were ineffective for failing to raise the following ten (10) sub-claims during his first appeal as of right: (1) the trial court erred in limiting cross-examination of Dalesandro; (2) the trial court erred in allowing impeachment of St. Clair; (3) charges submitted to the jury were duplicative and did not require a unanimous verdict; (4) the trial court erred in instructing the jury on *mens rea*; (5) the trial court erred in precluding Jim Aylward's testimony; (6) the trial court erred in instructing the jury regarding sentencing; (7) the trial court erred when it instructed the jury that it must be unanimous in finding a life sentence; (8) prosecutorial misconduct occurred at all stages of the trial; (9) trial counsel were ineffective at all stages of the trial; and, (10) the trial court erred in admitting victim impact testimony.  Noling raised these claims on direct appeal to the Ohio Supreme Court and they are therefore preserved for federal habeas review.[19]

A defendant is entitled to effective assistance of counsel in his first appeal as a matter of right. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).  The two-part test enunciated in *Strickland*, discussed above, is applicable to claims of ineffective assistance of appellate counsel.  Thus, Noling must demonstrate that his appellate counsel's performance was deficient, and that the deficient performance so prejudiced him that the appellate proceedings were unfair and the result unreliable.  *Strickland*, 466 U.S. at 687.

The Court finds that none of Noling's sub-claims are well-taken.  Because Noling raises all but

---

[19]    As noted above, Noling had different counsel on appeal to the Ohio Supreme Court than he had in the Eleventh District Court of Appeals.  Thus, pursuant to Ohio law, he was required to raise ineffective assistance of appellate counsel claims to the Ohio Supreme Court on direct appeal.  *State v. Cole*, 2 Ohio St.3d 112 (1982).

one of these claims as distinct grounds for relief, and the Court addresses each of these claims elsewhere in this Memorandum of Opinion, the Court finds that Noling cannot establish the prejudice he must to succeed on an ineffective assistance of appellate counsel claim.[20]  *See United States v. Hynes*, 467 F.3d 951, 970 (6th Cir. 2006)("We need not decide whether defense counsel performed deficiently if disposing of an ineffective-assistance claim on the ground of lack of sufficient prejudice would be easier.").

### G. Eighth Ground for Relief - Faulty Indictment

Noling alleges that the indictment that charged him with the aggravated murders of Bearnhardt and Cora Hartig was faulty, thereby denying him of his right to due process pursuant to the Fourteenth Amendment.  Specifically, he alleges that the capital specification in the indictment did not allege that he was the principal offender in the murder of Bearnhardt Hartig or that he killed him with prior calculation and design pursuant to Ohio Revised Code § 2929.04(A)(7).[21]  Instead, that specification to the indictment merely stated:

### *FIRST SPECIFICATION TO COUNT ONE - AGGRAVATING*

---

[20]     Specifically, the Court addressed the factual underpinnings of the sub-claims as follows: sub-claim (1) in ground for relief three; sub-claim (2) in ground for relief four; sub-claim (3) in ground for relief thirteen; sub-claim (4) in ground for relief nine; sub-claim (5) in ground for relief ten; sub-claim (6) in ground for relief fourteen; sub-claim (7) in ground for relief (12); sub-claim (8) in ground for relief five; sub-claim (9) in ground for relief six; and sub-claim (10) in ground for relief eleven.

[21]     That statute states in pertinent part:
>        (7) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the principal offender or, if not the principal offender, committed the aggravated murder with prior calculation and design.

Ohio Rev. Code § 2929.04(A)(7).

*CIRCUMSTANCES*
*The Grand Jurors further find and specify that the offense presented above, the murder
of Bearnhardt Hartig, was committed while TYRONE LEE NOLING, was committing
Aggravated Robbery and/or Aggravated Burglary.*
    *Said act being a Specification of Felony Murder.*
    *Contrary to and in violation of Section 2929.04(A)(7) of the Revised Code of
Ohio and contrary to the form of the statute in such case made and provided and
against the peace and dignity of the State of Ohio.*

*Return.*, Apx. Vol. I, at 20.  Thus, as is apparent when comparing the language in the indictment with

the statute as quoted above, the indictment failed to assert that Noling was either the principal

offender or that he killed with prior calculation and design.  Noling asserts that this failing entitles

him to federal habeas relief.

## 1. Recent precedent

To support his claim, Noling cites to two recent opinions.  In the first, the United States

Supreme Court reversed the Sixth Circuit Court of Appeals, finding that an omission in an indictment

was subject to a harmless error test.  In *Mitchell v. Esparza*, 540 U.S. 12 (2004), the Supreme Court

found that the Sixth Circuit erred when it failed to use a harmless error test in determining whether the

state courts unreasonably applied Supreme Court precedent.  In that case, the petitioner alleged that

his indictment was faulty because, similar to Noling, it did not charge that he was the principal

offender in the murder.  The trial court also failed to charge the jury on the definition of principal

offender.  The district court granted a writ of habeas corpus finding, *inter alia*, that the faulty

indictment was not subject to a harmless error test pursuant to the Supreme Court's opinion in

*Apprendi v. New Jersey*, 530 U.S. 466 (2000), which held that the Sixth Amendment does not permit a

judge to impose a sentence that would exceed the maximum sentence to which the defendant would

be exposed if punished pursuant to the facts found by a jury.  On appeal, the Sixth Circuit affirmed the

district court's decision, finding that the indictment, as charged, was the "functional equivalent of

76

'dispensing with the reasonable doubt requirement,'" in violation of the Eighth Amendment.  *Esparza*, 540 U.S. at 16.

The Supreme Court reversed the Sixth Circuit's decision.  It observed that in several non-capital cases, it previously had held that a trial court's failure to instruct a jury on all elements charged is subject to a harmless error analysis.  *Id.*  Reasoning that the punishment in a case should not alter its analysis, the *Esparza* Court concluded that faulty indictments are subject to a harmless error analysis.  Applying this test, the Court found that because the petitioner was the only person charged with the murder, the absence of language asserting that the was the principal offender was harmless.  Accordingly, it found that the state court's application of the harmless error test on appeal was not unreasonable and the petitioner was therefore not entitled to federal habeas relief.

In applying the *Esparza* holding, the Sixth Circuit found in *Joseph v. Coyle*, 469 F.3d 441 (6th Cir. 2006), that a habeas petitioner's faulty indictment was not harmless error.  There the petitioner's indictment misstated the law, charging that the petitioner caused the death of the victim "while committing or while fleeing immediately after committing *kidnapping*," rather than while committing murder, as is the language in the statute.  *See* Ohio Revised Code § 2929.04(A)(7), quoted *supra*, at footnote 22.  Neither the trial court, defense counsel, nor the prosecution corrected this error and the trial court incorrectly charged the jury pursuant to it.   Affirming the district court, the Sixth Circuit held that the indictment violated the Eighth Amendment's narrowing requirement and the Fourteenth Amendment's due process right.  After finding that the petitioner's indictment was faulty because it failed to give him notice of the capital specification, the Sixth Circuit held that the incorrect statements in the indictment had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 464 (quoting *Brecht v. Abrahamson*, 507 U.S. 619 (1993)).

77

## 2. Procedural default

Prior to deciding the merits of this claim, the Court first must discern if it is procedurally defaulted.  At the conclusion of the State's case, Noling's counsel objected to the language in the indictment and moved for dismissal pursuant to Ohio Rule of Criminal Procedure 29.[22]  The trial court denied the motion, finding that Noling had waived this issue because he did not raise it prior to the close of the State's case.  Noling raised this issue to the Ohio Supreme Court on direct appeal.  Like the trial court, the Ohio Supreme Court found that Noling had waived the issue.  Consequently, the court reviewed the claim for plain error.

Noling asserts that this Court can review the merits of the claim.  He contends that, pursuant to the district court's opinion in *Joseph v. Coyle*, No. 98 CV 527, slip op. (N.D. Ohio Dec. 22, 2004), a flaw in the indictment is jurisdictional in nature.  The Sixth Circuit's *Joseph* opinion, however, belies such an assertion.  In that case, the Sixth Circuit subjected the petitioner's Fourteenth Amendment due process claim to a procedural default analysis finding that, although the petitioner had defaulted the claim, ineffective assistance of trial counsel for failing to object to the indictment could serve as cause and prejudice to excuse the default.  *Joseph*, 469 F.3d 441, 458-59 (6th Cir. 2006).  Thus, the Sixth Circuit's *Joseph* opinion demonstrates that this type of claim can be subject to procedural default. The Court therefore finds that Noling's claim is procedurally defaulted.

---

[22]     That rule states in pertinent part:
> **(A) Motion for judgment of acquittal**
>      The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offense charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses.  The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.
> Ohio R. Crim. P. 29(A).

As he does with other claims, Noling asserts that the Court should find that the Ohio courts do not consistently apply procedural defaults in capital cases.  He also claims that he can demonstrate cause and prejudice to excuse the default based on ineffective assistance of counsel and actual innocence.  For the reasons stated elsewhere in this Memorandum of Opinion, the Court finds that those arguments are not well-taken.  Noling's eighth ground for relief is procedurally defaulted.

### 3. Merits

Even if it were preserved for federal habeas review, Noling's claim would lack merit.  To be on firm constitutional footing, an indictment must do the following: (1) it must contain the elements of the charged offense; (2) it must give the defendant adequate notice of the charges; and (3) it must protect the defendant against double jeopardy.  *Valentine v. Konteh*, 395 F.3d 626, 631 (6th Cir. 2005).  These requirements are applicable to the penalty phase of a capital case.  *Presnell v. Georgia*, 439 U.S. 14, 16 (1978).

Reviewing for plain error, the Ohio Supreme Court found that any faults in the indictment were harmless pursuant to the above standard.  It reasoned:

> We find no plain error because one could not reasonably conclude that but for the missing language the trial result would have been otherwise. And because Noling does not argue that the form of the indictment constitutes "a special category of forfeited erro[r] that can be corrected regardless of [its] effect on the outcome" of his trial, we need not and do not address that issue. *See id.* at fn. 2. The form of the indictment has caused no "miscarriage of justice." The indictment charged only Noling, and the state's evidence proved that Noling was the actual shooter, hence the principal offender. Moreover, the indictment afforded Noling adequate notice of the death penalty because both specifications specifically mentioned R.C. 2929.04(A)(7). *See State v. Joseph* (1995), 73 Ohio St.3d 450 (specification is sufficient if defendant knows which subsection has been alleged). Similarly, in *State v. Biros* (1997), 78 Ohio St.3d 426, 436, this court also found the defect waived when the accused failed to complain that the indictment did not include the "principal offender" language. *Accord Carter*, 89 Ohio St.3d at 597 (missing element of offense in rape-murder not fatal in view of failure to object). *Cf. State v. Bonnell* (1991), 61 Ohio St.3d 179 (no plain error although no instructions or jury finding as to "principal offender" status).

79

In the present case, unlike *Bonnell* and *Biros,* the trial court specifically instructed the jury that it must find whether Noling was the principal offender, and the jury specifically so found. Thus, this case differs from the issue the federal court recently decided in *Esparza v. Mitchell* (C.A.6, 2002), 310 F.3d 414. In *Esparza,* the trial judge never instructed the jury to determine whether the accused was the principal offender and the jury's verdict failed to find specifically that the defendant was the principal offender.

*State v. Noling*, 98 Ohio St.3d 44, 56-57 (2002).

The Ohio Supreme Court's decision comports with Supreme Court precedent in several respects.  First, it held that the indictment gave Noling sufficient notice of the capital specification by citing Ohio Revised Code § 2929.04(A)(7) even though it did not state the complete statutory language.  Moreover, it ruled, similar to the Supreme Court's decision in *Esparza*, that the indictment charged, and the State's evidence demonstrated, that Noling was the principal offender.  Finally, unlike the circumstances in *Joseph*, trial counsel raised the defective indictment issue to the trial court, albeit in an untimely fashion.  Because trial counsel brought this issue to the attention of the trial court, the trial court instructed the jury that it must find Noling was the principal offender.[23]

---

[23]    The trial court instructed the jury as follows:
            If you find the defendant guilty of aggravated murder as to Bearnhardt Hartig and/or Cora Hartig and also find that – he, meaning the defendant – was eighteen years old or older at the time the offense was committed * * * it is your duty to deliberate further and decide an additional factual question which we will call a specification as to each of the aggravated murder counts; that is, whether the State has proved beyond a reasonable doubt that the defendant is guilty of committing the offense while he was committing, attempting to commit, or fleeing immediately after committing or attempting to commit aggravated robbery and/or aggravated burglary, and that the defendant, Tyrone Lee Noling, was the principal offender in the aggravated murder.
            Principal offender means the actual killer, not merely one who aids and abets the actual killer.
*Return*, Trial Tr., Vol. 7, at 1528.

Thus, while Noling argues that the *Joseph* holding dictates a similar outcome in this matter, these cases are clearly factually distinguishable.[24]  For the reasons stated above, the Court finds that the Ohio Supreme Court's opinion finding that any defects in the indictment were harmless error is not an unreasonable application of *Esparza* or other federal precedent.

### H. Ninth, Twelfth, and Fourteenth Grounds for Relief - Jury Instructions

In these grounds for relief, Noling asserts that the trial court erred in instructing the jury at both phases of the trial.  The Court reviews these grounds for relief acknowledging that a federal habeas court may grant relief on the basis of an incorrect jury instruction only if a petitioner demonstrates that a particular instruction is more than merely "undesirable, erroneous, or even universally condemned." *Estelle v. McGuire,* 502 U.S. 62, 72 (1991)(citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Hardaway v. Withrow*, 305 F.3d 558, 565 (6th Cir. 2002); *Buell v. Mitchell*, 274 F.3d 337, 355 (6th Cir. 2001). Instead, a habeas petitioner must show that, taken as a whole, it is so infirm that it rendered the entire trial fundamentally unfair.  *Id.*  Thus, "only if 'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process' can [the federal habeas] court grant a writ."  *Baze v. Parker*, 371 F.3d 310, 327 (6th Cir. 2004)(quoting *Henderson,* 431 U.S. at 154).  The Supreme Court noted in *Estelle* that "we also bear in mind our previous admonition that we have defined the category of infractions that violate 'fundamental fairness' very narrowly." 502 U.S. at 72-73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

### 1. Ninth Ground for Relief

---

[24]    Moreover, the Court observes that much of the *Joseph* opinion is inapplicable to Noling because it involves an Eighth Amendment claim for failing to narrow the class of death-eligible defendants.  Noling, however, raises only a Fourteenth Amendment due process violation in the Petition.  *Petition*, at 15.

Noling contends that the trial court erred when it instructed the jury regarding the *mens rea* required to convict him of the murders.  He also argues that the causation instruction was defective because it used foreseeability language appropriate for civil liability cases.  Noling did not object to either instruction during trial, thus the Ohio Supreme Court found that both claims were procedurally defaulted.[25]  Moreover, Noling failed to raise these claims on direct appeal.  Although Noling asserts that Ohio's review of capital cases is not adequate and independent and that he can show cause and prejudice to excuse these claims based on ineffective assistance of appellate counsel and his actual innocence, this Court already has addressed and rejected these arguments and will not do so again here.  These claims are procedurally defaulted.

At the conclusion of the culpability phase of trial, the trial court charged the jury regarding *mens rea* and causation as follows:

> Purposely.  Purpose to cause the death of another is an essential element of the crime of aggravated murder.  A person acts purposely when it is his specific intention to cause a certain result.  It must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to cause the death of another.
>
> When the central idea of the offense is a prohibition against conduct of a certain nature, a person acts purposely when it is his specific intention to engage in conduct of that nature regardless of what he may have intended to accomplish by his conduct.
>
> * * *
>
> Cause is an act or failure to act which in a natural and continuous sequence directly produces the death of another person, and without which it would not have

---

[25]     Ohio courts have determined that a failure to contemporaneously object to an alleged error constitutes procedural default.  *State v. Williams*, 51 Ohio St.3d 112 (1977).   If a defendant fails to object to a trial error that would affect a substantial right, then the appellate courts will conduct a plain error analysis of that claim. *State v. Slagle*, 65 Ohio St.3d 597, 604 (1992).  The Sixth Circuit consistently has held that an Ohio appellate court's review for plain error does not constitute a waiver of its contemporaneous objection rule.  *Keith v. Mitchell*, 455 F.3d 662, 673-74 (6th Cir. 2006)(citations omitted).

occurred.

  The defendant's responsibility is not limited to the immediate or most obvious result of the defendant's act or failure to act.

  The defendant is also responsible for the natural, foreseeable consequences or results that follow, in the ordinary course of events, from the act or failure to act.

*Return*, Trial Tr., Vol. 8, at 1523-1524.

  In its alternative review on the merits, the Ohio Supreme Court found no plain error in the jury instructions.  It first held regarding the trial court's purpose instruction as follows:

> The jurors could not reasonably have been confused by this disputed instructional language. The trial court's instructions emphasized that Noling must have specifically intended to cause the death of another to be guilty of murder. Moreover, Noling's decision to repeatedly shoot Bearnhardt and Cora Hartig left no question as to his intentions. Finally, this court has previously rejected similar arguments in other murder cases. *See, e.g.*, *State v. Wilson* (1996), 74 Ohio St.3d 381, 392; [*State v.* ]*Carter* (1995), 72 Ohio St.3d 545, 552, 651 N.E.2d 965.

> Second, Noling argues that the causation instructions included inappropriate language for murder cases, as follows:

> "The defendant's responsibility is not limited to the immediate or most obvious result of the defendant's act or failure to act. The defendant is also responsible for the natural, foreseeable consequences or results that follow, in the ordinary course of events, from the act or failure to act."

> This court has held that such foreseeability language, while *inappropriate* in murder cases, does not create plain error. *See, e.g.*, *State v. Getsy* (1998), 84 Ohio St.3d 180, 196;  *Phillips*, 74 Ohio St.3d at 100; *State v. Frazier* (1995), 73 Ohio St.3d 323, 330.

*State v. Noling*, 98 Ohio St.3d at 57-8 (parallel citations omitted).

  These instructions were not so infirm that they rendered Noling's trial fundamentally unfair.

Although the Ohio Supreme Court held that the language regarding the causation instruction was

inappropriate, it did not create plain error.  Thus, while the instruction may have been "undesirable,"

under the *Estelle* holding, a petitioner is not entitled to relief on these grounds.  These claims have no

merit.

## 2. Twelfth Ground for Relief

In this ground for relief, Noling argues that the trial court required the jury to be unanimous in its verdict.  He claims that this instruction was constitutionally infirm because an individual juror may prevent a death sentence.  Noling failed to object to this instruction during trial.  Additionally, although he raised this claim to the Ohio Supreme Court, he failed to raise it to the Ohio Court of Appeals.  Accordingly, this claim is procedurally defaulted.  As in ground for relief nine, Noling asserts that Ohio's review of capital cases is not adequate and independent and that he can show cause and prejudice to excuse these claims based on ineffective assistance of appellate counsel.  As stated above, this Court already has addressed and rejected these arguments.

This claim is without merit in any event.  Noling's argument is akin to claiming that the trial court required the jury to first acquit him unanimously of the death penalty before considering whether an alternate sentence was appropriate.  The Sixth Circuit had in found *Spisak v. Mitchell*, 465 F.3d 684, 709 (6th Cir. 2006), that a jury instruction was constitutionally infirm because it was an "acquittal-first" instruction.  The *Spisak* court had held that the instruction the trial court provided prior to the sentencing phase of the petitioner's trial may have required the jury to unanimously find the presence of  mitigating factors in violation of the United States Supreme Court's holding in *Mills v. Maryland*, 486 U.S. 367 (1988).  *Id.* at 708.  Coupled with the verdict form, which required all twelve jurors to sign whatever verdict they reached, the *Spisak* court had held that the "acquittal-first" instruction "'would lead a reasonable juror to conclude that the only way to get a life verdict is if the jury unanimously finds that the aggravating circumstances do not outweigh the mitigating circumstances, an entirely different instruction from one that clearly informs the jurors that a life

84

verdict can be rendered by a jury that has not first unanimously rejected the death penalty." *Spisak*, 465 F.3d at 710 (citing *Davis v. Mitchell*, 318 F.3d 682, 689-90 (6th Cir. 2003)).

Although the *Spisak* opinion would have been binding authority directing this Court's decision,  the United States Supreme Court recently vacated the *Spisak* holding.  In *Hudson v. Spisak*, – U.S. – , 75 U.S.L.W. 3638 (Oct. 9, 2007), the Supreme Court summarily remanded the case to the Sixth Circuit to further consider its opinion "in light of *Carey v. Musladin*, 549 U.S. – (2006), and *Schriro v. Landrigan*, 550 U.S. – (2007)." *Id.*   Both these cases consider the deference a habeas court must cede to the state courts under AEDPA review.  *See Carey*, 549 U.S. – , 127 S.Ct. 649, 654 (2006)(holding state court did not unreasonably apply United States Supreme Court precedent when no such precedent exists); *Schriro*, 550 U.S. – , 127 S.Ct. 1993, 1944 (2007)(finding that district court did not abuse its discretion in denying petitioner's request for an evidentiary hearing for failure to show prejudice in ineffective assistance of counsel claim when state court made a factual determination that petitioner prohibited counsel from presenting mitigation evidence).  While the Sixth Circuit has not yet responded to this directive, it is clear that its holding in *Spisak* is no longer binding precedent on this Court.  Accordingly, the Court reviews Noling's claim disregarding that opinion.

The instruction the trial court provided to Noling's jury is as follows:

You shall recommend the sentence of death if you unanimously – means all twelve – find by proof beyond a reasonable doubt that the aggravated [sic] circumstances outweigh the mitigating factors.  If you do not find – if you do not so find, you shall unanimously, all twelve, recommend either life sentence, with parole eligibility after serving twenty full years of imprisonment, or life sentence with parole

eligibility after serving thirty full years of imprisonment.

*Return*, Trial Tr., Vol. 10, at 1939.

This instruction comports with United States Supreme Court precedent.  In *Mills v. Maryland*, 486 U.S. 367 (1998), and *McKoy v. North Carolina*, 494 U.S. 433 (1990), the Supreme Court determined that sentencing instructions that require jurors to unanimously find and agree on specific mitigating factors before using those factors in the weighing process are unconstitutional.  *Mills*, 486 U.S. at 384.  The sentence provided to the jury in the instant case does not run afoul of these holdings.  Rather than require that the jury unanimously agree on specific mitigating factors, the jury instruction regarding unanimity in Noling's trial merely required the jury to be unanimous in reaching a verdict.  Accordingly, the Court finds that the Ohio Supreme Court's decision to deny this claim was not clearly contrary to any United States Supreme Court precedent.

### 3. Fourteenth Ground for Relief

In this ground, Noling complains that the trial court penalty phase instruction permitted the jury to decide what evidence is relevant regarding the aggravating circumstances and failed to inform the jury that it could only consider aggravating circumstances attached to each count of aggravated murder in conducting the weighing process for that count.  The Ohio Supreme Court found that this claim was waived both because Noling failed to contemporaneously object to it on appeal and because he failed to raise this claim in the Court of Appeals.  The court then summarily found no plain error.

This claim lacks merit in any event.  Even if these instructions were erroneous, they did not so infect the outcome of the jury's sentencing that the outcome of Noling's trial could be deemed fundamentally unfair.  Moreover, the Ohio Supreme Court's re-weighing of the sentence on appeal cured any trial court error.  *See Brown v. Sanders*, 546 U.S. 212, 220 (2006)(holding a death sentence

is only invalid if "[a]n invalidated sentencing factor . . . will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances.").

### I. Thirteenth Ground for Relief - Consideration of Aggravating Factors

Noling argues here that the trial court erred because it failed to merge the aggravating factors before the penalty phase of trial.  Although defense counsel requested that the trial court instruct the jury on either the § 2929.07(A)(3) or § 2929.07(A)(7) aggravating factors, the trial court denied the request.[26]  Noling argues that the jury's consideration of these duplicative factors tipped the scales towards a death verdict.  Noling raised this claim on direct appeal to the Ohio Supreme Court and it is therefore preserved for federal habeas review.

In its review of this claim, the Ohio Supreme Court found that the trial court did not err in failing to merge these aggravating factors because trial evidence suggested different motivations for the murder of Cora Hartig (to escape detection for the killing of her husband), than for killing Bearnhardt Hartig.  Moreover, as the Ohio Supreme Court observed, the Eleventh District Court of Appeals' had already merged of the aggravating factors when the Ohio Supreme Court conducted its own independent re-weighing of them.  *State v. Noling*, 98 Ohio St.3d 44, 59 (2002).

As cited above, the recent United States Supreme Court case *Brown v. Sanders*, 546 U.S. 212, – , 126 S.Ct. 884 (2006), is instructive here.  In that case, the Supreme Court dispensed with the

---

[26]    Section 2929.04(A)(3) states in pertinent part:
        (A) The offense was committed for the purpose of escaping detection,
        apprehension, trial, or punishment for another offense committed by the
        offender.
Ohio Rev. Code § 2929.04(A)(3).  *See also* § 2929.04(A)(7), quoted above.

"weighing" vs. "finding" classification it previously utilized to classify a state's method of determining whether a death sentence is appropriate.  It held that "[a]n invalidated sentencing factor . . . will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances."  *Id.* at 892 (footnote omitted).  Clearly, because the § 2929.04(A)(3) and § 2929.04(A)(7) are duplicative, evidence pertaining to one would be relevant in considering the other.  Thus, pursuant to *Saunders*, this claim is not well-taken.

## VIII. CERTIFICATE OF APPEALABILITY

The Court now must determine whether to grant a Certificate of Appealability ("COA") for any of Noling's grounds for relief.  The Sixth Circuit Court of Appeals has determined neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability."  *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001)(remanding motion for certificate of appealability for district court's analysis of claims).  Thus, in concluding this Opinion, this Court now must consider whether to grant a COA as to any of the claims Noling presented in his Petition pursuant to 28 U.S.C. § 2253.

That statute states in relevant part:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –
    (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause.  The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a *constitutional* right, rather than the federal right that was required prior to the AEDPA's enactment.

The United States Supreme Court interpreted the significance of the revision between the pre- and post-AEDPA versions of that statute in *Slack v. McDaniel*, 529 U.S. 473 (2000).  In that case, the Court held that § 2253 was a codification of the standard it set forth in *Barefoot v. Estelle*, 463 U.S. 880 (1983), but for the substitution of the word "constitutional" for "federal" in the statute.  *Id.* at 483.  Thus, the Court determined

> "[t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "'adequate to deserve encouragement to proceed further.'"

*Id*. at 483–04 (quoting *Barefoot*, 463 U.S. at 893 n.4).

The Court went on to distinguish the analysis a habeas court must perform depending upon its finding concerning the defaulted status of the claim.  If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong."  *Id.* at 484.  A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted.  In those instances, the Court opined, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.*

89

(emphasis supplied).

After taking the above standard into consideration, the Court finds as follows.  The Court will not grant a COA for ground 1, sub-claim (1) because Noling raised it for the first time in post-conviction proceedings and that court barred the claim on ground of *res judicata*.  Also barred by *res judicata* are grounds for relief 6, sub-claim (8), and sub-claims (11)-(15).  The Court denies a COA for grounds for relief 3, 5, sub-claims (5)-(15), 6, sub-claims (1)-(7), 8, 9, 10, 12, and 14.  Noling failed to raise these claims in to the Court of Appeals prior to appealing them to the Ohio Supreme Court.  In many instances, he also failed to contemporaneously object to these claims during trial.  They are therefore unequivocally procedurally defaulted.  No COA will issue for these grounds.

The Court will not issue a COA for ground for relief 1, sub-claim (2)(actual innocence based on co-defendants' affidavits).  The Eleventh District Court of Appeals found that the affidavits were not reliable.  Noling has not demonstrated that this finding is an unreasonable one in light of any United States Supreme Court precedent.  Jurists of reason would not debate this finding.

No COA will issue for ground for relief 2 ("other acts" evidence).  The Ohio Supreme Court's finding that there were enough similarities between the prior robberies Noling committed and the one in which he killed the Hartigs is not an unreasonable one.  Moreover, as stated above, a habeas court can only grant relief if it finds that the decision to admit evidence was so egregious as to deny the right to due process.  Clearly, that was not the case here.  The Court denies a COA as to ground for relief 4 (trial court declared St. Clair a hostile witness) on similar grounds.  The trial court's ruling was based on state law, not subject to federal habeas review.  Moreover, its finding that St. Clair was a hostile witness pursuant to Ohio Rule of Evidence 607 did not rise to the level of a due process violation.  Jurists of reason would not debate these findings.

90

Jurists of reason also would find unequivocal this Court's decision to deny ground for relief 5, sub-claim (1) (use of peremptory challenges to excuse death-hesitant jurors).  As stated above, the United States Supreme Court has never held that a prosecutor's use of a peremptory challenge to excuse a juror constitutes a due process violation.  Thus, no COA will issue for this claim.  A reasonable jurist also would not find debatable this Court's decision to deny ground for relief 5, sub-claim (2) (presentation of false testimony).  As the Court held in its Opinion, Noling in essence is requesting that this Court assess the credibility of the witnesses who testified during trial.  A habeas court cannot perform this type of review.

Ground for relief 5, sub-claim (3) (*Brady* claim) does not merit a COA.  Noling cannot argue successfully that he and his co-defendants' whereabouts at the time the State asserts the murders occurred was something in the exclusive control of the State.  Jurists of reasons would not disagree.  No COA will issue for sub-claim (4) of Noling's fifth ground for relief (reference to BCI expert testimony).  As the Ohio Supreme Court opined, it was a reasonable inference from the evidence presented that Noling had to reload his weapon to fire the numerous shots used to kill the Hartigs.  Finally, reasonable jurists would not debate the Court's decision to deny relief for ground 5, sub-claim (16) (prosecutor argued death sentence appropriate).  The Ohio Supreme Court determined that this argument was reasonable, particularly in light of the trial court's instruction that counsel's arguments were not to be considered evidence.  No COA will issue for this ground.

No COA will issue for ground 6, sub-claims (9) and (10) (ineffective assistance of counsel for failure to investigate other suspects and failure to impeach co-defendants regarding smoking gun, respectively).  As the Court stated above, Noling supplies the Court with no real evidence, other than the fact that Leman owed Hartig money, to support his theory that he is actually innocent of the

murder.  Thus, Noling cannot demonstrate that his counsel were unreasonable for failing to investigate Leman as a suspect or that he was prejudiced by it.  Similarly, the Eleventh District Court of Appeals correctly found that counsel's failure to question Noling's co-defendants regarding whether Noling's gun was smoking had absolutely no effect on the outcome of the trial.  Jurists of reason would not debate this finding.

No jurist of reason would debate the Court's decision to deny ground for relief 7 (ineffective assistance of appellate counsel).  As stated above, the Court found that, because the basis for which he asserted grounds for relief were all reviewed and rejected by this Court as distinct grounds for relief, Noling cannot establish the prejudice necessary to establish this claim pursuant to *Strickland*.  No COA will issue for this ground.

Reasonable jurists would not debate this Court's decision to deny relief for ground 11 (admission of victim impact evidence).  As stated above, other than mere conjecture, Noling cannot demonstrate that the trial court actually considered the testimony of a Hartig relative when formulating its sentencing opinion.  Thus, the Court will not issue a COA for this ground.

Finally, no COA will issue for ground for relief 13 (trial court failure to merge aggravating factors).  As the Court held in its Memorandum of Opinion, the duplicative aggravating factor did not cause the jury to consider evidence it would not have considered if the trial court had only charged on one of these aggravating factors.  Thus, pursuant to *Saunders*, this claim has no merit.  All reasonable jurists would agree.

## IX. CONCLUSION

For the reasons stated in this Opinion, this Court finds that none of the claims asserted in the Petition for a Writ of Habeas Corpus under 28 U.S.C. §2254 are well-taken.  Accordingly, the

Petitioner's request for habeas corpus relief is denied.  The Petition is hereby dismissed.

The Court finds that no reasonable jurist could debate the Court's findings regarding its procedural default analysis.  Furthermore, no reasonable jurist would find the Court's decision that the non-defaulted claims are without merit is debatable pursuant to *Slack*.  Accordingly, the Court hereby **DENIES** a COA regarding its procedural default decisions and decision to deny the writ on the merits of the claims.

For the foregoing reasons, Tyrone Noling's Petition for a Writ of Habeas Corpus,  is hereby **DENIED**.   The Court certifies that, pursuant to the above reasoning, there is no basis on which to issue a certificate of appealability under 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  Further, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith.

IT IS SO ORDERED.

   s/ Donald C. Nugent
DONALD C. NUGENT
United Stated District Judge


DATED:   January 31, 2008